MENTAL HEALTH ASSOCIATION OF MINNESOTA, and H.C., K.F., J.M., and C.A., on behalf of themselves and others similarly situated, Plaintiffs,

v.

Richard S. SCHWEIKER, Secretary of the United States Department of Health and Human Services, Defendant.

No. 4–82–Civ. 83.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 22, 1982.

Martha A. Eaves and Mark A. Bohnhorst, St. Paul, Minn., for Southern Minnesota Regional Legal Services, Inc.

Leonard Rubenstein and Jane Bloom Yohalem, Washington, D.C., Mental Health Law Project.

Messinger, Cooper & Norton, William Messinger, Minneapolis, Minn., for Mental Health Ass'n of Minn.

Mary L. Egan, Asst. U.S. Atty., Minneapolis, Minn., for U.S. Dept. of Health & Human Services.

Gabriel L. Imperato, Baltimore, Md., for Social Sec. Admin.

Elisa Vela, Washington, D.C., for Dept. of Justice, Civil Div.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR PRELIMINARY INJUNCTION

LARSON, Senior District Judge.

INTRODUCTION

The above matter came on for trial on plaintiffs' Motion for Preliminary Injunction on November 10, 1982. The Court heard evidence over seven days. Sixteen witnesses presented oral testimony in the Courtroom, and the testimony of one of these witnesses was also presented by depo-

sition transcript. Seven additional witnesses testified solely through deposition transcript. The Court received in evidence in excess of 90 exhibits, many with multiple subparts.

The plaintiff class consists of severely mentally ill individuals suffering from psychotic or functional non-psychotic disorders, whom defendant has determined to be not disabled under the Social Security Act, Titles II and/or XVI, on the basis that such individuals are capable of engaging in substantial gainful activity. The class consists of both those whose applications for benefits have been denied and those whose benefits have been terminated.

Defendant Richard A. Schweiker is the Secretary of the United States Department of Health and Human Services. He is responsible for the administration of the Social Security Act, including the disability programs under the Act. Defendant administers these programs through a central office in Baltimore, Maryland, through various regional offices, and through state Disability Determination Service (DDS) offices within each state. Initial determinations of disability or non-disability (both on initial applications and on review for possible terminations) are performed by the DDSs.

The plaintiffs filed their Amended Complaint on May 12, 1982, seeking preliminary injunctive relief on a class-wide basis and adding several parties as class representatives. The Amended Complaint was allowed and a class was preliminarily certified on August 16, 1982.

The Court's understanding of the issue to be tried was as follows:

(1). Plaintiffs claim that the disability evaluation standard being applied to them conflicts with the SSA statute and regulations, has never been properly promulgated in accordance with the Federal Administrative Procedure Act and is violative of due process of law. Plaintiffs claim that the disputed standard imposes a presumption that where an individual does not meet or equal the Appendix Listing, that individual is assumed to have a residual functional capacity (RFC) for at least unskilled work.

When the presumed RFC is then considered in conjunction with the sequential evaluation process for disability, the result is denial for younger workers (age 18–49).

(2). Defendant claims that no such RFC presumption exists, and that defendant is processing all of the class members' claims in accordance with the mandate of the sequential evaluation process. Defendant further claims that the Court lacks jurisdiction over this action. On December 6, 1982, after the conclusion of trial, the Court denied defendant's motion to dismiss.

The trial afforded the Court an extensive view of the SSA disability program, including the five-step sequential evaluation process, the nature of chronic mental illness, and the existence, nature and effects of the disputed presumption upon an individual's claim for benefits.

The Court was aided by exhibits produced by both plaintiffs and defendant, expert testimony by leading psychiatrists and a psychologist in the field of care and treatment of the chronic mentally ill in the community, as well as testimony by DDS directors and employees, social workers, employees of the Chicago regional and central SSA offices, and others.

The Court's Findings of Fact and Conclusions of Law are set forth in six numbered topics (I–VI) hereafter.

## FINDINGS OF FACT

### I. STATUTORY AND REGULATORY FRAMEWORK

1. The federal Social Security Disability Insurance program (Title II of the Social Security Act) provides insurance benefits for those persons who have contributed to the program and who suffer from a physical or mental disability, defined by statute as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute provides that a mental or physical

impairment is considered disabling if it is "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In order to be found disabled, a person must suffer from a medical impairment and be unable to work because of that impairment.

2. In addition to the Social Security Disability Insurance program, the federal government provides benefits for indigent, disabled individuals pursuant to a program known as Supplemental Security Income (SSI) for the aged, blind and disabled (Title XVI of the Social Security Act). The statutory standards for disability determinations under SSI are identical to those for Social Security Disability Insurance determinations. 42 U.S.C. § 1382c(a)(3)(A).

3. The Secretary of Health and Human Services (the Secretary) has promulgated regulations governing determination of eligibility for Social Security Disability Insurance and for SSI disability payments. 20 C.F.R. Part 404, Subpart P; 20 C.F.R. Part 416, Subpart I. The standards for disability determinations under both programs are substantially identical.

4. The regulations require that a five-part sequential evaluation process be used to evaluate disability claims. The first step requires the Secretary to disqualify from benefits an individual who is working at substantial gainful activity. 20 C.F.R. § 404.1520(a) and 416.920(a). The second step requires a demonstration of the severity of the impairment. If the impairment is found "not severe," the Secretary must disqualify the individual from benefits. *Id.* 404.1520(c) and 416.920(c). At step three, an individual whose impairment meets or equals the severity level described in the Listing of Impairments is presumed disabled on the basis of that severity level alone. *Id.* 404.1520(d) and 416.920(d).

5. The Listing of Impairments is a list of conditions, signs and symptoms which are deemed by the Secretary to be so severe that their presence alone, without further evidence of inability to work, justifies a finding that the individual is entitled to disability benefits. 20 C.F.R. § 404.1520(d); § 404.1525(a). This list of conditions, signs and symptoms is at 20 C.F.R. 404, Subpart P, Appendix I. Conditions, signs and symptoms which equal the severity level of those included in the Listing will also justify a presumption of disability without further evidence of inability to work. 20 C.F.R. § 404.1520(d); § 404.1526. In the category of Mental Disorders, § 12.00, a finding is rarely made that a condition equals the Listing.

6. None of the first three steps of the sequential evaluation process involves assessment of residual functional capacity (RFC) or consideration of the vocational factors of age, education and work experience.

7. The fourth step of the process involves two sub-steps: (1) a determination of the claimant's residual functional capacity (RFC), and (2) a determination whether the claimant has sufficient RFC to return to the physical or mental demands of his past relevant work. *Id.* 404.1520(e) and 416.-920(e). The determination of residual functional capacity requires a practical examination of what the individual can do despite the limitations resulting from his impairment. For individuals whose disability is based on a mental impairment, the evaluation of RFC must include consideration of "ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting." *Id.* § 404.1545(c) and 416.945(c).

8. The evaluation of RFC is a medical assessment, but it is not limited to formal medical findings. The RFC assessment may encompass other pertinent evidence that will assist in determining the extent to which the impairment will prevent the claimant from functioning in the world of work. *Id.* 404.1545 and 416.945. For claimants whose impairments do not meet or equal the severity level of the Listing, the assessment of RFC is often the most impor-

tant aspect of the sequential evaluation process.

9. If the individual cannot do his past work the fifth step of the process is employed. Five factors are assessed in the fifth step: the individual's RFC, age, education, and work experience, and the demands of other jobs in the national economy. If the individual is found unable to do other work which exists in substantial numbers in the economy, a finding of disability is made. *Id.* 404.1520(f) and 416.920(f).

10. Consideration of the vocational criteria of age, education and work experience is required by statute. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). "Age" refers to chronological age and to the extent to which age affects a person's ability to adapt to new work situations and to do work in competition with others. *Id.* §§ 404.1563(a) and 416.963(a). A person between the ages of 18–49 is considered a "younger worker." "Age" generally is not considered to be an adverse vocational factor until age 50, or in some limited situations age 45. *Id.* §§ 404.1563(b) and 416.-963(b).

11. "Education" is used primarily to mean formal schooling or other training which contributes to a person's ability to meet vocational requirements. *Id.* §§ 404.-1564(a) and 416.964(a).

12. "Work experience" refers to skills and abilities a person has acquired and applies when the work was done within the last 15 years, lasted long enough for the person to learn to do it, and was substantial gainful activity. *Id.* §§ 404.1565(a) and 416.965(a).

13. Past work skills or experience, or formal education, are not required for an individual to perform unskilled work. *Id.* 404.1568 and 416.968. These factors, therefore, are "not adverse" when assessing an individual's ability to do unskilled work.

14. The regional offices of the Social Security Administration directly supervise the state DDS agencies in the region and insure that the law, regulations and policies of the Social Security Administration are correctly implemented. The states within the Chicago Region are Minnesota, Wisconsin, Illinois, Indiana, Ohio and Michigan.

## II. THE NEW POLICY

15. A new policy was developed by SSA beginning in early 1980 concerning eligibility for mentally impaired claimants. In accordance with that policy, SSA determined that persons whose mental impairment does not meet or equal the Listing of Impairments retain sufficient residual functional capacity to do at least unskilled work.

16. Central office documents from this period were written before there was litigation on this issue. The documents evidence a policy shift. Prior to the policy shift, the central office acknowledged that many case situations arise where impairments do not meet or equal the Listing, yet do preclude work. Disability in such cases was based on restricted RFC and was awarded on a "medical-vocational" basis. National data indicate that in early 1980 27.5% of mental impairment allowances were awarded on a medical-vocational basis.

17. Under the new policy, evaluation of RFC may not be considered in addition to, or separate from, evaluation of impairment severity under the Listing. A separate RFC rating is "redundant." Under the new policy, it is inconsistent for an individual both (a) to have an RFC which is so restricted as to preclude substantial gainful activity, and (b) not to meet or equal the Listing. Stated "precedents" for this line of analysis were found in the "Grids" regulations and statutory provisions requiring that certain individuals must meet or equal the Listing to be allowed.

18. Dr. Herbert Blumenfeld, Chief Medical Officer of the SSA, wrote some of these memoranda. His testimony at trial was not substantially different from the statements of policy found in the earlier memoranda. Defendant failed to call any of the other policy makers whose names appear on the documents and who were involved in the shift of policy.

19. Under the new policy, an individualized, realistic evaluation of ability to work

is not performed at any stage of the sequential evaluation process. The new policy changes the evaluation of RFC by introducing a presumption that applies to all individuals whose condition fails to meet or equal the Listing of Impairments.

20. Under the new policy, a finding of disability based on a restricted RFC is not permitted.

21. The final two steps in the sequential evaluation process—(1) comparing the individual's RFC to the requirements of his past work and (2), if he is unable to do his past work, comparing his RFC to the requirements of other jobs in the national economy, considering his age, education and work experience—do not cure the presumption created by the new policy. Under the new policy, these two steps involve the matching of an already identified residual functional capacity (RFC) for unskilled work with the requirements of the claimant's past job or those of other jobs.

22. The vocational profile—age, education and work experience—is considered if a claimant cannot perform the duties of his or her past work. A significantly adverse vocational profile could result, at this stage, in a finding of disability. In evaluating capability for unskilled work of a younger individual, no factor in the vocational profile is "adverse". Under the new policy, findings of disability are limited to those persons who have an "adverse" vocational profile.

23. For class members, the determination that an individual has sufficient residual functional capacity to do at least unskilled work is tantamount to a denial of benefits. The decision whether a mentally impaired claimant under age 50 receives benefits or is denied them is reduced, by the new policy, to a one-step determination: Does the individual's impairment meet or equal the Listing?

24. The SSA medical staff purport to distinguish capacity to do unskilled work from capacity to engage in work activity. They make this distinction to clarify that the medical assessment of RFC is not a final decision on eligibility—a matter not within the physician's jurisdiction. For mentally disabled claimants this is a distinction without a difference since the consequence of a finding of capacity to engage in unskilled "work activity" is a denial or termination of benefits.

## III. THE FAILURE OF DEFENDANT'S NEW POLICY TO ASSESS ABILITY TO WORK

25. The defendant's reliance on the Listing as the basis for a disability decision can be justified only if the Listing of mental impairments adequately measures the ability of class members to work. The Listing fails to make this assessment. Defendant has so conceded.

26. The Listing of Mental Impairments is found at §§ 12.00–12.05 of Appendix I. One of the sections of the mental impairments Listing most commonly relied on is section 12.03—the Listing for functional psychotic disorders. Section 12.03 requires that patients suffering from mood disorders, schizophrenias or paranoid states (functional psychotic disorders) evidence both A and B:

A. Manifested persistence of one or more of the following clinical signs:
   1. Depression (or elation); or
   2. Agitation; or
   3. Psychomotor disturbances; or
   4. Hallucinations or delusions; or
   5. Autistic or other regressive behavior; or
   6. Inappropriateness of affect; or
   7. Illogical association of ideas.
B. Resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people.

Section 12.04 of the mental impairments Listings is similarly divided into two sections: the A part, listing conditions, symptoms and signs; and the B part, listing restrictions in daily functions.

27. In order for a condition to meet the Listing of mental impairments, a claimant must evidence at least one of the clinical signs noted in A, such as hallucinations or agitation or delusions, and all three of the

restrictions noted in B—resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people. If any one of these requirements is missing, the claimant's condition will be found to fall short of meeting or equaling the Listing.

28. The Listing includes only the most severe psychiatric impairments. On January 25, 1982, the Regional Medical Advisor for the Chicago Region, Dr. Sandor Berendi, wrote that it is "practically impossible" to meet the Listing " . . . for any individual whose thought processes are not completely disorganized, is not blatantly psychotic, or is not having a psychiatric emergency requiring immediate hospitalization . . ." Dr. Berendi, a psychiatrist certified by the American Board of Neurology and Psychiatry and defendant's witness, noted that " . . . In fact an individual may be committable due to mental illness according to the State's Mental Health Codes and yet found capable of 'unskilled work' utilizing our disability standards . . ."

29. The Court heard testimony of some of the leading experts in the area of the nature of chronic mental illness and its effect upon patients' ability to work. Extensive and knowledgeable testimony also was received addressing methods by which these patients' ability to work may be assessed. The Court finds the testimony of Drs. Arthur Meyerson, William Anthony, Leonard Stein, William Knoedler and Steven Greenwald informed, credible and of substantial assistance.

30. Scientific research and clinical data in the fields of psychiatry and rehabilitation psychology demonstrate that the Listing of mental impairments does not measure ability to work. Neither the symptoms contained in the A portion of the Listing, nor the daily functional ability provisions contained in the B portion of the Listing, measures or predicts ability to work. A patient's ability to meet the minimum mental demands of work often is impaired by the patient's illness, even in the absence of psychotic symptoms or severe restrictions in social or daily activity.

31. The testimony of plaintiffs' experts established that:

(a) Chronic mental illness is characterized by an exquisite sensitivity to stress and a decrease in coping skills;

(b) Good psychiatric care and good supportive services can enable many chronic mental patients to function day-to-day in the community on a level which would not meet the Listing. Often this functional level is achieved by artificially low psychological pressure, medications and support from services such as out-patient facilities, day care programs, social work services and other similar assistance;

(c) If stress is increased by sending such patients to work, many will rapidly deteriorate and lose their ability to function. Some will need hospitalization;

(d) Substantial numbers of these individuals rely upon the Social Security disability programs for income support and for payment of medical care and medications;

(e) Work therapy, and a progression where possible toward competitive work, is often used by professionals in the treatment of the chronic mentally ill;

(f) Many of the chronic mentally ill engage in some types of work activity in workshops, volunteer programs, or work adjustment programs; many of the chronic mentally ill are capable of such work-type activities but not of substantial gainful activity;

(g) For the chronic mentally ill, the assessment of the residuals of the illness and of its impact on ability to perform competitive work requires an evaluation of the ability to meet even minimal mental demands (such as appearing at work every day or being on time) and other RFC factors presently considered under the regulations. *Id.* 404.1545(c) and 416.945(c).

32. The Psychiatric Review Form, and the 17 factors listed on that form, are not relevant to determining whether someone has the residual functional capacity to work.

33. SSA has no medical, vocational or other empirical or scientific basis for presuming that a mentally impaired person whose condition does not meet or equal the Listing retains the residual functional capacity to work. SSA has conducted no studies of its own, nor does the research of others support its presumption. No scientific basis exists for presuming that the items on the Psychiatric Review Form assess ability to work.

34. There are factors which reliably predict whether a chronic mental patient can work. Where work is not obviously precluded by severe symptoms or other factors, analysis of recent prior work history, analysis of the reaction of the patient to stressful situations, and evaluation in a work setting or work-like setting can identify mentally impaired persons who, as a result of their illness, cannot work.

35. Substantial numbers of the chronic mentally ill population which is maintained outside the institutional setting would not be able to do substantial gainful activity, but would also not reflect the persistent symptomotology of the Listing Part A or the restricted functional levels of Part B.

36. For this group of disability claimants, an assessment of RFC ordinarily would be determinative of the capacity to do substantial gainful activity, even where the vocational factors of age, education, and work experience are not adverse.

## IV. DISSEMINATION OF THE NEW POLICY WITHIN THE CHICAGO REGION

37. In the past, findings of disability based on a restricted RFC were made for younger mentally impaired persons in the Chicago Region. This policy is reflected in documents such as a March 19, 1979 letter of the Assistant Regional Commissioner to the Director of the Ohio DDS agency:

[T]he RFC assessment is based on the individual case facts and there can be instances where the individual's impairment falls short of the listings yet the RFC is so restricted as to preclude unskilled work.

Examples of such individuals include schizophrenics who do not manifest the severe level of symptoms required by the Listing, yet who cannot work, and individuals who can function in a stress-free, supportive environment but who deteriorate rapidly in a work situation.

38. Beginning some time late in 1979, state DDS agencies and regional offices in many regions began noting returns from SSA central office quality assurance reviews which cited errors in cases where the state agencies had found that mentally impaired applicants, who failed to meet or equal the Listing, still could not work based on a restricted residual functional capacity. Beginning in January 1980 and continuing throughout that year, memoranda asking for clarification of the policy were received by both the SSA central office and SSA regional offices.

39. For the Chicago region, the issue was addressed in October 1980 at a Medical Issues Conference held by the Chicago regional office for medical and management staff of all the state DDS agencies in the region. The state agencies asked at that conference for clarification of the policy concerning the evaluation of residual functional capacity in the area of mental impairments. The state DDS agencies explained that returns from the SSA central office and the regional office

[imply] that a mental disorder either meets the level of severity of the listings or the severity of the disorder is less than the intent of the listings and the claimant should have the RFC for low stress work.

The state agencies wanted to know whether this was, in fact, SSA policy.

40. On December 23, 1980, an official State Agency Memorandum, which summarized the questions and answers presented at the October 7–8, 1980 conference, was distributed to state DDS agencies by the Chicago regional office. That memorandum, State Agency Memorandum 80–60, responded to the specific question about the evaluation of residual functional capacity in the mentally impaired population as follows:

Addendum: Where the overall psychiatric rating is less than meets or equals, the individual retains a mental RFC for at least some type of unskilled work activity. (This addendum was added by Dr. Blumenfeld subsequent to the conference).

41. The state DDS agencies responded with further inquiries, both written and oral. The regional office replied by advising the state agencies that the question had been referred to the SSA central office. A central office policy analyst specifically informed regional office staff that the term "unskilled work activity" in SAM 80–60 meant "unskilled work."

42. On March 30, 1981, the Chicago regional office sent another State Agency Memorandum (SAM 81–8), to all the state DDS agencies in the region to clarify the matter. SAM 81–8 reiterated the policy set forth in the Blumenfeld addendum to SAM 80–60, in greater detail. It stated:

For any mental impairment which falls short of the listing but is severe, there are some remaining functional capacities. That is, the impairment itself does not prevent all work per se. While there would be some limitations in the ability to perform those duties specified in POMS 2382.1, it is expected that the individual would at least retain the mental capacity for unskilled work.

43. The policy stated in the Blumenfeld Addendum and in SAM 81–8 was understood by the Chicago regional office and the state DDS agencies to be the official policy of the Social Security Administration—a policy they were required to follow in evaluating cases.

44. Following the receipt of SAM 81–8, the Ohio DDS agency modified its state claims manual to reflect the new policy. The Ohio manual instructed the state claims examiners:

When a mental impairment is less severe than listing level (meets or equals) then the claimant retains a mental RFC for at least some type of unskilled work activity. Thus a finding of disability on a medical vocational basis cannot be made for younger individuals . . . .

Leonard Herman, the Director of the Ohio State DDS agency, explained in his deposition:

Q. If the individual does not meet or equal the appendix listings and is younger and unskilled and has minimal work experience—

A. —he will be considered capable of simple routine work and found not disabled.

45. The Michigan state DDS agency distributed to all claims examiners, physicians and other state agency personnel a memorandum dated May 28, 1981. This memorandum informed state agency personnel:

. . . that almost every psychiatric claim that falls short of meeting or equalling a listing will be a denial. The only apparent exception to this would be the individual of advanced age, a limited education and no work experience.

The memorandum acknowledged that " . . . this is a significant change from the way we have been evaluating and adjudicating these cases."

46. The Minnesota state DDS agency modified its adjudication of mental impairments following SAM 80–60 and SAM 81–8. Robert Sternal, the Director of the Minnesota State DDS agency, testified that Minnesota, after questioning the policy repeatedly, concluded that younger workers (those under age 50) who did not meet or equal the Listing were to be denied. This has resulted in denials of benefits to mentally impaired persons who previously would have been approved.

47. The Wisconsin DDS agency amended its Manual of Adjudication Procedures (MAP) on May 15, 1981, to reflect the policies in SAM 80–60 and SAM 81–8. Wisconsin amended its procedures manual because the agency's staff was not familiar with the new policy set out in SAM 80–60 and SAM 81–8—that a mentally impaired person who does not meet or equal the Listing should be presumed to have the residual functional capacity for unskilled work.

48. The consequence of the policy applied in the Chicago region of SSA is that younger individuals whose mental impairments do not meet or equal the Listing of Impairments will be found not disabled; disability based on a restricted RFC is precluded. This "established program policy" was described by Dr. Berendi on February 25, 1982, as follows:

... if claimant's impairment severity falls short of the Listings, he/she retains residual functional capacity for at least unskilled work.

49. As of trial this policy continues to be followed by the state DDSs in the Chicago region. The central office of SSA is informed that this policy is being followed within the Chicago region. Defendant has been specifically informed that alteration to this policy would have "severe implications." Defendant has failed to mandate that this policy be rescinded either by the regional office or by the state DDSs.

50. Defendant claims that it is placed in the unfair position of having to "prove a negative" in responding to plaintiffs' extensive proofs of the policy being applied. This claim is without merit. Defendant had an opportunity to disprove plaintiffs' assertions either through introduction of exhibits or through presentation of live or deposition testimony of state or regional office personnel. These documents and witnesses were under defendant's control; defendant failed to adduce any substantial or convincing evidence that plaintiffs' allegations are incorrect.

51. Plaintiffs' claims, if incorrect, could have been disproved in another manner. Plaintiffs claim that "medical-vocational" allowances have been virtually eliminated for class members. The files of all class members are under defendant's control, as are data or computerized information systems relating to these files. One response to the claims made by plaintiffs' Complaint, filed May 12, 1982, is proof that substantial numbers of medical-vocational allowances for class members have been made within the Chicago region. If plaintiffs' claims were incorrect, defendant could have affirmatively disproved them on the basis of data and records under defendant's control. It appears that plaintiffs suggested a sampling of defendant's files as early as June 1982.

52. Defendant failed to adduce any substantial evidence that significant numbers of class members have been approved on a medical-vocational basis. Defendant has directed the Court's attention to certain individual cases; none of those cases involved a determination by either a state DDS or the Chicago regional office that a class member be granted benefits on a medical-vocational basis for the period March 1, 1981 to the present.

53. Defendant's statistical proofs were not produced during pre-trial discovery, though plaintiffs' counsel indicated a formal request was served in August 1982. The information was not produced until the middle of trial; defendant withheld the regional information even during the deposition of Mr. Hughes, held the morning of the same day as his testimony. The data indicates that within the Chicago region, for all mental impairments and all age groups, for a substantial sample of cases, only 6.3% of allowances were on a medical-vocational basis. Defendant's conduct with respect to production of this data has made it impossible to determine what portion of this 6.3% represents non-class members (mentally retarded cases, chronic brain syndrome cases, persons age 50 or older). The weight of the testimony supports the inference that little of this 6.3% represents class members. Defendant's statistical evidence is entitled to little weight.

54. Defendant's failure to adduce any substantial defense from defendant's own agents, documents or data is significant.

## V. IMPACT ON CLASS MEMBERS

55. Dr. Berendi has explained the impact of the policy on class members in a January 25, 1982 memorandum to SSA's central office:

Currently, a significant number of psychiatric patients who clinically manifest

an inability to engage in persistent substantial gainful activity are denied disability benefits due to the fact that they fall short of the psychiatric listings. Many individuals with serious residual symptoms (mostly chronic schizophrenics) have made marginal adjustment to everyday demands of semi-independent living outside of a mental institution, only while they are not under any psychological stress. Usually they also require various supporting services (e.g., local Community Health Centers, Social Workers, and RN's in half-way houses, etc.). The overwhelming majority of these individuals are currently denied as having a severe impairment with a RFC enabling them to do at least unskilled work.

Defendant did not repudiate this memorandum at trial.

56. The claims of mentally impaired individuals have been reviewed in large numbers as part of the accelerated review of cases which began in March, 1981. Substantial numbers of these individuals have been terminated.

57. A very large proportion of class members who appeal the termination of their benefits to an Administrative Law Judge (ALJ) have been reinstated. A review of all the files of decided cases of such class members from the Minneapolis Office of the Office of Hearings and Appeals has demonstrated an 80% reversal rate.

58. The appeals process does not adequately protect the class. Social Security Disability Insurance recipients lose all benefits, including medical benefits, shortly after receiving a termination notice. During the time their appeals are pending, which can take as long as a year, they receive no benefits. Class members often are not capable of understanding the forms sent to them by SSA or of properly filing an appeal. Because of their illnesses, these individuals frequently are unable to present their own cases. Many have no representative prior to the time benefits are terminated.

59. The Court has received substantial evidence that class members who have been denied benefits or have had benefits terminated have suffered serious harms such as deterioration of their medical conditions, disruption of physician-patient relationships, inability to pay for essential medications, and agitation and extreme anxiety associated with attempting to pursue the administrative process. These harms concern the very medical condition on account of which benefits were awarded or are sought. These harms are not recompensable through a retroactive award of benefits.

60. Class members also suffer severe harm through the loss of monetary benefits. Most class members have been reduced to a bare subsistence level provided by General Assistance or similar state or county relief programs.

61. The Court is satisfied that these harms are representative of the types of harms which would be suffered by the class in general as the result of denial or termination of benefits.

## VI. CONCLUSIONS OF LAW

62. Plaintiffs have established a substantial probability of success on the merits as to the following:

(a). The policy identified in the Findings of Fact violates the Social Security Act, the implementing regulations thereunder, the requirements of case law, and is arbitrary, capricious, irrational, and an abuse of discretion.

(1). Defendant lacks any rational or colorable basis for the policy.

(2). By use of this policy, the defendant has terminated the benefits of and denied new benefits to class members who cannot engage in substantial gainful activity by reason of a medically determinable impairment.

(3). By use of this policy, the defendant has terminated the benefits of and denied new benefits to class members without a proper assessment of the individuals' capacity to engage in substantial gainful activity.

(4). Findings of non-disability based on the application of this policy are void.

(b). The policy identified in the Findings of Fact is unlawful under the Administrative Procedure Act's rulemaking provisions. 5 U.S.C. § 553.

(1). The policy has had a serious, substantial impact on the rights of persons subject to agency regulation.

(2). The policy has had a substantial effect on the manner in which defendant has reached decisions as to disability for members of the plaintiff class.

(3). The policy constitutes a substantive rule or policy but has never been published for notice and comment rulemaking in the Federal Register.

(4). The policy is void and subject to injunction by the Court.

(5). Findings of non-disability based on application of the policy are void.

(c). Defendant has failed to discharge a mandatory duty to rescind the unlawful policy.

(1). Defendant and his agents had actual knowledge that the policy identified in the Findings of Fact was being applied in the Chicago region.

(2). Defendant and his agents had actual knowledge that the policy had severe implications for adjudication of claims of class members.

(3). Defendant and his agents have had ample opportunity to rescind this policy but have failed to do so.

(4). This policy continues to be applied within the Chicago region.

(5). Plaintiff class members have suffered severe and irreparable harm as a result of the application of this policy and will continue to do so unless it is rescinded.

(6). Plaintiff class members have no administrative remedies to compel defendant to rescind this policy.

(d). Due process of law requires that benefits to class members who are Title II beneficiaries be continued until decision by an Administrative Law Judge (ALJ) following a hearing.

(1). Findings of non-disability as to class members made by DDS agencies are subject to a high rate of error.

(2). Determinations to discontinue class members' disability benefits are not based on routine, standard medical tests. *Contrast, Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976).

(3). The available evidence indicating a reversal rate of 80% (*Contrast, Mathews, Id.,* 424 U.S. at 346–47, 96 S.Ct. at 908) is highly relevant.

(4). Class members suffer severe harm, pending hearings before ALJs, of a type not recompensable by a retroactive award of benefits.

(5). Defendant proffered no evidence as to the administrative cost of continuing benefits pending hearings. In view of the available evidence as to reversal rates, such costs are significantly less than in *Mathews, Id.*

(6). Many class members, because of their mental impairments, are not capable of effectively utilizing available administrative procedures without assistance of a representative.

(7). It offends notions of fundamental fairness to terminate the benefits of such a class of persons prior to the opportunity for an evidentiary hearing before an ALJ.

63. Members of the class have suffered severe and irreparable harm as the result of the application of the unlawful policy.

64. The unlawful policy continues to be applied within the Chicago region.

65. There is no evidence that any harm to defendant from issuance of an injunction would outweigh the severe harm suffered by the plaintiff class.

66. The public interest favors issuance of a preliminary injunction.

(a). There is no public interest in shifting financial responsibility for the psychiatrically disabled from a solvent disability fund to state and local government.

(b). Defendant's conduct jeopardizes the public interest which favors de-institutionalization of those who can be de-institutionalized.

168

67. The scope of appropriate injunctive relief depends on the degree of violation established. *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). Having carefully weighed all of the evidence presented at trial by plaintiffs and defendant, together with the arguments of counsel for the parties, the Court determines that the following Order for Preliminary Injunction should issue forthwith.

. IT IS ORDERED:

1. Defendant, and his respective officers (including the Commissioner of the Social Security Administration (SSA), and the Commissioner of the Chicago regional office of SSA), and his agents, servants, employees, and all persons in active concert or participation with them (including each of the state DDSs within the Chicago region) or any of them who receives actual notice of this order by personal service or otherwise (hereinafter agents), be, and they hereby are, restrained and enjoined, pending further order, from continuing, attempting to continue, or otherwise enforcing the standard that a younger worker (age 18–49) who suffers from a severe mental impairment which does not meet or equal the Appendix Listing § 12.00, retains the residual functional capacity (RFC) for at least unskilled work. Defendant and his agents are by this order enjoined from drawing any conclusion regarding the extent of residual functional capacity (RFC) from the fact that the individual fails to meet or equal the Appendix Listing § 12.00.

2. Defendant and his agents are hereby ordered to issue written instructions to all state DDS agencies and to all divisions of the SSA regional office within the Chicago region, including the quality assurance review offices, stating that:

A. The standard that a younger worker (age 18–49), who suffers from a severe mental impairment which does not meet or equal the Appendix Listing § 12.00, retains the residual functional capacity (RFC) for at least unskilled work is rescinded, and that no such rule is in effect; and that no conclusions regarding the extent of residual functional capacity (RFC) can be drawn

from the fact that the individual fails to meet or equal the Appendix Listing § 12.-00;

B. Any memorandum, letter, Informational Digest item, POMS section, return comment, or oral statement which implied, stated or implemented such a standard or conclusion is rescinded;

C. That evaluation of the residual functional capacity (RFC) of a younger individual who suffers from a severe mental impairment which does not meet or equal the Appendix Listing § 12.00 shall be in accordance with the steps outlined in 20 C.F.R. 404.1545 and 20 C.F.R. § 416.945;

D. That evaluation of the residual functional capacity (RFC) of a younger individual who suffers from a severe mental impairment which does not meet or equal the Appendix Listing § 12.00 shall be based on a realistic assessment of the individual's remaining capacity to function in the conditions of the real world of work, and these remaining capacities must also be measured in accordance with the ability to meet the minimum standards of a normal, competitive work setting on a sustained basis including consideration of observations of work limitations made outside a formal medical examination such as workshop evaluations, work adjustment evaluations, past work successes and/or failures, and other relevant reliable information that may be available from third parties;

E. That in assessing the RFC of younger individuals, substantial weight shall be accorded information provided by treating sources (particularly in the case of chronic mental patients), caution shall be exercised in relying upon information or conclusions of non-examining physicians, or upon physicians who have examined the claimant only once, and treating sources shall be permitted an opportunity to review and comment on information or opinions advanced by non-treating sources;

F. That in the assessment of a younger individual whose impairment does not meet or equal the Listing of Impairments in Appendix § 12.00, a limited residual functional

capacity (RFC) can be the determinative factor of a disability decision even in the absence of adverse vocational factors;

G. That where a realistic evaluation of an individual's RFC, age, education and work experience indicates that a younger individual, (who does not meet or equal the Listing of Impairments in Appendix § -12.-00) cannot perform substantial gainful activity such person must be found disabled under the Act.

3. Defendant and his agents are hereby ordered to review all claims of all class members whose application for benefits was denied on or after March 1, 1981, on a priority basis; and to notify all such class members that their claim for benefits is being reviewed, that the initial denial may have been in error, that the Social Security Administration may be asking for additional evidence relating to the impairment, and that if the Social Security Administration determines that the initial denial was in error the claimant will be entitled to back benefits from the date of the application.

4. Defendant and his agents are hereby ordered to restore ongoing benefits commencing with the date of this Order to all class members who have been ceased from benefits on or after March 1, 1981.

5. Defendant and his agents are hereby ordered to begin immediately a review by the State DDSs of persons restored to ongoing benefits pursuant to paragraph 4 in order to determine whether they are eligible for retroactive benefits; provided, however, that for class members whose cases are awaiting hearings before or decisions by ALJs, the individual shall have the option of proceeding before the Office of Hearings and Appeals rather than proceeding with the DDS review.

6. Defendant and his agents are hereby ordered to allow plaintiffs' attorneys reasonable access to all class members' files within the Chicago region processed following the date of entry of this Order; and to provide to plaintiffs' attorneys copies of all memoranda, drafts of policy statements or similar documents developed following the entry of this Order and concerning evalua-

tion of residual functional capacity for younger individuals with severe mental impairments.

7. Defendant and his agents are hereby required to publish in selected newspapers of large circulation, and in all known professional or community journals and newsletters specifically directed to the mental health community or to providers of mental health services, a notice of the terms of this Court's order and of the rights of class members to obtain reconsideration of prior denials and to obtain reinstatement of ongoing benefits; and requiring defendant to send a like notice to all state public welfare agencies and state mental hospitals in the Chicago region of the Social Security Administration, together with a request that those agencies and hospitals assist in locating and identifying class members.

8. Defendant and his agents are hereby ordered to publish any new rules concerning the evaluation of RFC for individuals with mental impairments for notice and comment rulemaking in the Federal Register, as required by the Administrative Procedure Act, prior to their adoption or enforcement.