Eleon ALLEN, individually and for others similarly situated, Plaintiffs-Appellees,

v.

Margaret HECKLER, et al., Defendants-Appellants.

No. 84–5612.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1985.

Decided Dec. 31, 1985.

Irene M. Solet, Rockville, Md., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and William Kanter, Washington, D.C., were on the brief, for defendants-appellants.

Leonard S. Rubenstein, with whom Arlene S. Kanter, Washington, D.C., was on the brief, for plaintiffs-appellees.

Before WRIGHT and MIKVA, Circuit Judges, and FRIEDMAN,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

* Sitting by designation pursuant to 28 U.S.C.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting Opinion filed by Circuit Judge FRIEDMAN.

MIKVA, Circuit Judge:

This appeal involves a claim under the Rehabilitation Act of 1973. 29 U.S.C. § 701 *et seq.* (1982) ("the Act"). Section 501 of the Act, 29 U.S.C. § 791 (1982), requires each federal executive department to formulate an affirmative action plan that provides adequate career opportunities for handicapped people. The plaintiffs, a class of former patients at St. Elizabeth's, a federal mental hospital, were hired by the Hospital pursuant to one such plan. They now claim that this plan is inadequate because it allows St. Elizabeth's to discriminate against them on the basis of their previous institutionalization.

The district court agreed and granted summary judgment in favor of the plaintiffs. We now affirm the court's finding of discrimination, but vacate and remand for reconsideration of the remedy.

I.

Eleon Allen, the named plaintiff, is a former patient at St. Elizabeth's Hospital, a federal mental institution in Washington, D.C. After his discharge as a patient in 1978, Allen was hired by St. Elizabeth's as a housekeeping aide pursuant to 5 C.F.R. § 213.3102(h) (1984) ("subsection (h)"). Subsection (h) provides that patients who have been discharged from federal mental hospitals may be given special hiring consideration at the institution where they previously received treatment. The key to subsection (h) is that ex-patients are excused from the usual competitive process for obtaining federal employment, and thus are considered "excepted" service employees. *See* 5 U.S.C. § 2103 (1982); 5 C.F.R. § 213.101(a) (1984). Although the former patients must have the necessary skills for the jobs they seek, it is considered "not

§ 291(a) (1982).

practical" to subject them to the competitive civil service examination. 5 C.F.R. § 213.3101 (1984).

Excepted employees, such as the ex-patients here, perform exactly the same work as their "competitive" service counterparts. Their duties and responsibilities are the same, their work is judged by the same standards, and their pay is the same. The excepted workers, however, are given fewer job benefits than competitive employees. Subsection (h) workers may not participate in the civil service retirement program. 5 C.F.R. § 831.201(14) (1984). If they are disciplined or discharged, they do not have the right to an evidentiary hearing before an independent decisionmaker, or the right to appeal to the Merit Systems Protection Board. *See* 5 U.S.C. §§ 7501 *et seq.*, 7511 *et seq.* (1982). Excepted workers also have fewer job protections and no "bumping" rights (*i.e.*, no right to take jobs from employees with less seniority) when there is a reduction in work force. *See* 5 C.F.R. § 351.403(b)(2) (1984).

An excepted worker under subsection (h) is free to enter the competitive service at any time by taking the regular civil service exam; the drawback is that the excepted worker must start on the same footing as a first-time applicant. The former patient enjoys no advantage because of his on-the-job experience, nor does he get seniority or other credit for the time spent before conversion toward permanent career status, the federal equivalent of tenure. *See* 5 C.F.R. § 315.201(a) (1984).

Allen and fifty-two other former patients ("plaintiffs") working at St. Elizabeth's sued the Director of the Department of Health and Human Services and the Director of the Office of Personnel Management ("the government") under the Rehabilitation Act. Section 501 of the Act requires that each executive department and agency promulgate an affirmative action plan that provides adequate "hiring, placement, and advancement" opportunities for handicapped people. 29 U.S.C. 791(b). The plaintiffs contend, and the government does not contest, that they are "handi-capped" within the meaning of the Act. Although plaintiffs are no longer institutionalized, the Act recognizes that discrimination also occurs against those who at one time had a disabling condition. The handicap that these people face is the continuing stigma of being a former psychiatric patient; this disability did not disappear upon discharge from the hospital, as the dissent apparently believes. The regulations thus define a handicapped person as, *inter alia*, one who "has a *history* of . . . a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1613.702(a)(2), (d) (1984) (emphasis added); *see In re Ballay*, 482 F.2d 648, 688–69 (D.C.Cir.1973) (discussing stigma of prior institutionalization).

Plaintiffs claim that granting excepted workers fewer benefits for the same work is discrimination based on their previous medical condition. They argue that subsection (h) violates the Act's affirmative action requirement because it does not provide "adequate" advancement opportunities. The district court (per Judge June Green) agreed and granted summary judgment in favor of the plaintiff class. As a remedy, Judge Green ordered that all subsection (h) employees who had completed two years of satisfactory service must be allowed to convert to competitive status, with full benefits and credits. *Allen v. Heckler*, No. 83–0226, slip op. at 7–8 (D.D.C. July 5, 1984) ("July 5 Decision").

The government makes two claims on appeal: first, that subsection (h) does not violate the Act because it does not distinguish among workers on the basis of handicap; second, that the district court's remedy was improper in these circumstances.

## II.

■ There is clearly tension, if not conflict, between the two well-meaning attempts to assist the handicapped at issue in this case. The subsection (h) excepted service program was created by St. Elizabeth's in the 1950s to help recently discharged mental patients return to the work force. Doctors at the Hospital believed

that without some special assistance, former patients might be unable to find jobs because of the stigma that follows people who have been institutionalized. By excusing ex-patients from the civil service exam and employing them in familiar surroundings, it was hoped that they would build a good employment record to help them return to the work force when they left the Hospital.

The Rehabilitation Act of 1973 was a more sweeping, statutory attempt to combat all forms of discrimination against the handicapped. Congress made it clear in both the Act and its 1978 amendments, Pub.L. No. 95–602, 92 Stat. 2955 (codified in scattered sections of 29 U.S.C. (1982)) that it viewed discrimination against the handicapped as an evil on a par with racial, sexual, and ethnic discrimination. *See* S.Rep. No. 95–890, 95th Cong., 2d Sess. 18–19 (1978), U.S.Code Cong. & Admin. News 1978, pp. 7312, 7329–7330. The Act is a command to remove artificial barriers that prevent handicapped citizens from reaching their full potential. Recognizing the federal government's obligation to be an equal opportunity employer, *id.* at 18, U.S.Code Cong. & Admin.News 1978, p. 7329, the Act requires each department and agency to take affirmative steps to hire and promote handicapped workers. 29 U.S.C. § 791(b) (1982); *Gardner v. Morris,* 752 F.2d 1271 (8th Cir.1985).

Given this statutory command, subsection (h) clearly falls short of the Act's affirmative action requirement. Giving unequal benefits for equal work is precisely the type of treatment the Act was designed to eliminate. Hiring the excepted workers under a special provision does not justify giving them second-class status once they are on the job. *See Fowler v. United States,* 633 F.2d 1258, 1263 (8th Cir.1980) (distinguishing disparate hiring criteria from disparate terms of employment once hired). As the district court pointed out, it would be anomalous if "[t]he very program that was designed to provide these individuals with equal opportunity, now denie[d] them that right." *Allen v. Heckler,* No. 83–0226, slip op. at 12–13 (D.D.C. May 4, 1984) ("May 4 Decision").

The government argues that even though excepted workers are treated differently than competitive workers, the distinction is legitimate because it is not based on handicap. Instead, the government claims that excepted workers are not entitled to full benefits because they chose a different (and easier) avenue for obtaining employment. Since former patients are exempt from the civil service exam, the reasoning goes, the Hospital is free to set their compensation without regard to the benefits received by competitive workers. The government claims that an employee's level of benefits thus turns on the choice of whether to be an excepted or a competitive employee.

The argument seeks to prove too much, however, and thus ignores the clear holding of this court in *Shirey v. Devine,* 670 F.2d 1188 (D.C.Cir.1982). *Shirey* involved a challenge to a regulation nearly identical to the one in this case. 5 C.F.R. § 213.-3102(u) (1973) ("subsection (u)"). Subsection (u) provided that physically handicapped workers could be hired as excepted employees, although with fewer benefits than their competitive colleagues. Mr. Shirey, who was deaf, was hired by the National Aeronautics and Space Administration (NASA) under subsection (u) in 1973. After several years of satisfactory performance, he was laid off when NASA reduced its work force. He claimed that his lay-off violated the Rehabilitation Act because unlike his co-workers, he did not have the right to "bump" junior employees. 670 F.2d at 1189–90.

This court affirmed Shirey's claim that this denial of benefits violated § 501. Judge Wright wrote for the majority that the "[c]ategorical, permanent denial of equal status is fundamentally inconsistent with the plain meaning and the purpose of Section 501." *Id.* at 1200. The court specifically rejected the argument that the distinctions among NASA workers were based on the application process rather than the characteristics of the employee. Subsec-

tion (u), said the court, differed from most other excepted service positions because it did not define the *type* of position to be filled, only the medical *condition* of the employee. *Id.* at 1192; *cf.* 5 C.F.R. § 213.-3102(a), (b), (d) (1984) (categorizing excepted positions by profession).

The government argues that *Shirey* is inapplicable to this appeal. It claims that the crucial finding in *Shirey* was that there was discrimination against deaf workers in the *competitive* hiring process. Because of this bias, a handicapped worker's only choice was to accept a subsection (u) position or be left with no job at all. The lack of an alternative application route, argues the government, led the *Shirey* court to conclude that distinctions between jobs were drawn along handicapped/non-handicapped, rather than competitive/excepted, lines.

The government concludes that the district court's fatal error in this case is that it failed to find that former mental patients were similarly discriminated against in the competitive hiring process. Unless this finding is made, the government claims, we must conclude that former patients voluntarily chose to be excepted workers. It asserts that the plaintiffs' equal *access* to jobs in the competitive service distinguishes this case from *Shirey*, and renders the district court's decision legally flawed.

Although this argument has intuitive appeal, we think it affords *Shirey* a narrow and miserly application. Discrimination in the hiring process was not the *ratio decidendi* of the case. The court instead found discrimination because subsection (u) was inconsistent with the rationale of an affirmative action plan. The court made it clear that an agency's duty not to discriminate "at least" means that workers cannot be given fewer benefits solely because of their handicap. 670 F.2d at 1201. Judge Wright held that the government has to take affirmative steps to help the handicapped; § 501 is more than a command to preserve the status quo. *Id.* at 1201–02. It is not enough to treat excepted workers differently, and then justify it by pointing out

that there are alternative ways to gain equal treatment. In short, the obligation to assist the handicapped is not dependent on a finding in each case that the status quo is discriminatory. *Id.; see Southern Illinois Builders Ass'n v. Ogilvie*, 471 F.2d 680, 684 (7th Cir.1972) ("The obligation to take affirmative action imports more than the negative obligation not to discriminate.").

The *Shirey* court did recognize that the competitive application process had discriminated against the deaf in the past. 670 F.2d at 1202. But the government incorrectly describes this finding as the linchpin of the decision. Judge Wright merely noted that it was an "illustration" of the relationship between past discrimination and continuing employment practices. *Id.* Nowhere does he indicate that *absent* discrimination in the competitive process, disparate treatment of the handicapped would be allowed.

In *Fowler v. United States, supra*, the Eighth Circuit was faced with a challenge to a parallel regulation allowing mentally retarded workers to be hired into the excepted service. 5 C.F.R. § 213.3102(t) (1984) ("subsection (t)"). The arguments were the same as they are here and in *Shirey*, except that in *Fowler* the discrimination claim was brought under the equal protection clause rather than the Rehabilitation Act. 633 F.2d at 1259. Mr. Fowler was a mentally retarded worker who was fired without a hearing, a protection afforded competitive employees. The *Fowler* court held that subsection (t) resulted in unlawful discrimination because the disparate treatment was "not based on the nature of the position being filled, but on the nature of the employee filling it." *Id.* at 1263. The court pointed out that the government had confused unequal hiring criteria—which are permissible—with unequal employment benefits, which are illegitimate absent some state interest or justification. *Id.*

Subsection (h) would be less problematic if there were a fair way for former patients to convert from the excepted to the compet-

itive service. But as the trial court found, there is no way for the patients to convert; their only option is to apply, along with all other applicants, for a position as a first-time federal worker. May 4 Decision at 7. This arrangement gives the workers no seniority credit for time spent in the excepted service. So before a worker can take a step forward to enjoy equal pay for equal work, he must first step back to an entry-level position. Surely the protections of the Rehabilitation Act are not this illusory.

These considerations and the case law reinforce our conclusion that the government may not justify disparate treatment of the handicapped simply because they were beneficiaries of the excepted hiring process. The Act requires that unless there is a legitimate government interest to the contrary, handicapped employees must be treated the same as other workers. We therefore affirm the district court's decision that subsection (h) does not provide adequate opportunities to former mental patients, in violation of § 501 of the Act. Fashioning a remedy for such unequal treatment, however, is more complicated.

### III.

The trial court recognized the difficulties in devising a remedy. The relief order has to end the discrimination, and at the same time respect the government's interest in assisting the handicapped. Judge Green's order allowed all subsection (h) employees who have completed two or more years of satisfactory service to convert to career or career-conditional status, which would automatically grant all the benefits and protections of the competitive service. July 5 Decision at 7–8. Newly converted workers also would receive seniority credit for their time in the excepted service. *Id.*

This remedy is modeled after the revised subsections (t) and (u), which were amended by Executive Order in 1979. The regulations now allow both physically handicapped and mentally retarded workers with two years of excepted-service experience to convert to competitive status without taking an exam. Exec.Order No. 12125, 5 C.F.R. § 315.709, *reprinted in* 5 U.S.C. § 3301 at 523 (1982). For some reason, subsection (h) was not amended at the same time.

Although it might seem logical to make subsection (h) conform to the requirements of closely parallel provisions, we have determined that this symmetrical approach is flawed. Such a remedy would impermissibly interfere with a legitimate government interest because it fails to account for work-related differences between former mental patients and other handicapped workers. We therefore remand to the district court for a reconsideration of the remedy.

There is obviously some government interest in distinguishing between handicapped and non-handicapped employees. The existence of the excepted service confirms this: if handicapped employees did not require special consideration, affirmative action goals could be best met by immediately placing excepted workers in the competitive service, with full benefits and protections. But when subsections (t) and (u) were amended, mentally retarded and physically handicapped people were not given full rights instantly; instead they were given a two year "trial" period. If after two years the employee's handicap proves not to be an impediment to satisfactory performance, the government's interest in treating the excepted class differently disappears.

The problem in the current case is that there are continuing differences between former mental patients and other excepted employees. While a mentally retarded or physically handicapped person's condition usually remains constant or changes gradually, a former mental patient's status is more prone to rapid change. *See, e.g., Mental Health Association v. Schweiker,* 554 F.Supp. 157, 162 (D.Minn.1982) (increase in stress may lead to rapid deterioration in condition of mentally ill workers with certain types of illness). A subsection (h) employee may perform perfectly well

for several years, and then have recurring problems that require prompt attention, for the sake of both the worker and the employer.

The possibility of recurring problems was recognized by the Second Circuit in *Doe v. New York University*, 666 F.2d 761 (2d Cir.1981), where a former mental patient brought suit under § 504 of the Act, 29 U.S.C. § 794 (1982), to compel her admission to medical school. After her initial hospitalization, plaintiff's symptoms of mental illness lay dormant for almost seven years before reemerging. She was then re-hospitalized periodically for several years, but at the time of her suit had gone more than four years without apparent problems. Although there was testimony that plaintiff was cured, the court held that the medical school was entitled to consider the likelihood of a reoccurrence of the illness when evaluating her application. *Id.* at 778–79.

The government and St. Elizabeth's have a strong interest in maintaining the flexibility to handle these situations as they arise. In a slightly different context the *Shirey* court said that

> It may well be that some individuals have handicaps that would make it impossible for them to do any job other than the one to which they were first appointed, and for these denial of some job protections might be warranted even under Section 501.

670 F.2d at 1204. But as anyone familiar with the civil service knows, removing a competitive status employee from his job is a slow and painstaking process. A former patient who is insulated by the competitive-service job protections may experience continuing mental problems, yet the Hospital would be powerless to respond immediately to correct the situation. The ultimate result might well be contrary to the purpose of the Act: St. Elizabeth's might hire only those with a low risk of recurring problems (those least in need of the excepted service program), while those with uncertain diagnoses would be denied the benefits of subsection (h).

On remand, the district court should fashion a remedy that takes account of this interest. Benefits concerning tenure of employment protections should not diminish St. Elizabeth's flexibility to set reasonable rules for granting or denying job tenure to excepted workers, as their condition dictates. We hasten to add, however, that any benefits or protections *unrelated* to this interest must be granted in full. It is impermissible, for example, to deny subsection (h) workers full pension rights and other financial benefits, since the government has no interest in treating former patients differently in these respects. Even protections against reductions in force should be given without distinction, since they do not affect the Hospital's ability to treat workers according to their individual needs. While the district court is still free to require a two-year delay before granting excepted workers benefits unrelated to the government interest, a *permanent* denial violates the Act; these non work-related benefits must be given to all employees within a reasonable time.

This distinction between former mental patients and other handicapped workers is fully consistent with our decision in *Shirey* and the Eighth Circuit's opinion in *Fowler*. *Shirey* says that a "substantial government justification" would permit different treatment of handicapped workers, even under § 501. 670 F.2d at 1204. And in *Fowler*, the court noted that the government failed to show even a rational interest in granting partial benefits to excepted workers. 633 F.2d at 1258. In short, the case law does not require that competitive and excepted workers always be treated identically, regardless of the competing interests. *Cf. J.W. v. City of Tacoma, Washington*, 720 F.2d 1126, 1130 (9th Cir. 1983) (cannot discriminate on basis of stereotype, but court "assume[s]" that people "with a history of mental illness *may* sometimes present special problems best addressed by special legislative measures") (emphasis in original).

Distinguishing former patients from other handicapped employees is also consistent

with the goals of the Rehabilitation Act. As Judge Wright has noted, "the handicapped" are not a homogeneous group; the only trait shared by the handicapped is that their capabilities are altered in some respect. *Shirey,* 670 F.2d at 1204. To mechanically treat all handicapped workers as though they faced the same challenges would be both inaccurate and unwise. As two distinguished commentators point out:

> Failure to make necessary distinctions among the varieties of physical disability is common alike to popular and professional thought, with consequences often destructive to the effectiveness of social provisions intended for welfare and rehabilitation.

tenBroek & Matson, *The Disabled and the Law of Welfare,* 54 Calif.L.Rev. 809, 811 (1966), *quoted in Shirey,* 670 F.2d at 1204 n. 45.

### CONCLUSION

We emphasize the narrowness of our disagreement with the district court. We affirm the finding below that subsection (h) violates § 501 of the Rehabilitation Act. We also agree that at some point excepted workers are entitled to most of the benefits enjoyed by their competitive counterparts. Commendable as the government's initiative in hiring these workers may be, it defeats the clear command of statute and fairness to treat them as inferior employees in benefits and protections afforded to others. Any distinctive treatment must be related to legitimate work-place needs that the government may have.

We therefore vacate the remedy and remand only for a reconsideration of the handicapped workers' entitlement to those benefits relating to job tenure, in light of the government's legitimate interest in preserving flexibility. In all other respects we affirm.

*It is so ordered.*

FRIEDMAN, Circuit Judge, dissenting:

I would reverse the district court's grant of summary judgment in favor of the appellees and direct that court to dismiss their complaint. In my view, St. Elizabeth's Hospital's practice of hiring its former mental patients by appointing them under 5 C.F.R. § 213.3102(h) (1984) (subchapter (h)) to positions in the excepted service without requiring them to meet the standards necessary for appointment in the competitive service, and without their obtaining all the benefits of the competitive service, is consistent with the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (1982), and does not improperly discriminate against those employees on the basis of their former institutionalization in the Hospital.

Ordinarily, an individual obtains an executive branch position in the federal civil service by passing a competitive examination that establishes his or her qualifications for the position sought. After completing a probationary period, an employee thus appointed becomes entitled to the rights and benefits that the civil service system provides. Congress has recognized, however, that there are certain categories of federal positions that should not be subject to the competitive appointment requirements of civil service and therefore has provided for the "excepted service" to cover those positions. 5 U.S.C. § 2107 (1982). Persons appointed to the excepted service do not receive the same rights and benefits as the employees in the competitive service.

In its governing regulations, the Office of Personnel Management has specified a number of positions that are in the excepted service, which may be filled without following the regular procedures for appointment in the classified service. Two of these categories cover individuals who, because of their handicaps, would not be qualified for initial appointment in the competitive service. These provisions are 5 C.F.R. §§ 213.3102(t) and (u), which respectively cover "mentally retarded persons" and "severely physically handicapped persons." Employees in either of these two categories may be converted to competitive status "[u]pon completion of 2 years of

satisfactory service under this authority. . . ."

The present case involves subsection (h) of the regulation, which authorizes the appointment at federal mental institutions of former patients of those institutions, who have been discharged and have been certified by medical authority "as recovered sufficiently to be regularly employed but it is believed desirable and in the interest of the persons and the institution that they be employed at the institution." All of the appellees in this case are in that category. They were appointed to positions at St. Elizabeth's Hospital without having to meet the competitive civil service requirements that other persons seeking the same position would have had to satisfy.

Specifically, the appellees were not required to pass a competitive examination, and they were given only indefinite appointments that provided some, but not all, of the rights and benefits that competitive service employees have. They may obtain government health and life insurance, but do not have the tenure rights and all the protections given in the Civil Service Reform Act of 1978, 5 U.S.C. § 2301 *et seq.* (1982), to employees in the competitive service. Indeed, some of them might not have been eligible for competitive appointment to their present positions, since by statute some (which the appellees fill) may be filled only by persons entitled to veterans preference (if such persons are available). 5 U.S.C. §§ 2108(3); 3310 (1982).

The differences between subsection (h) and subsections (t) and (u) are substantial. The latter two subsections deal with persons who are disabled at the time of their appointment and therefore would not qualify for the job under the usual competitive examination procedures. Those individuals are given temporary appointments but, if after two years they have demonstrated their ability to perform the job, they are converted to the competitive status and have the rights and benefits they would have obtained initially had they not been disabled from passing the competitive examination.

Persons given indefinite appointments under subsection (h), on the other hand, are former patients of the mental institution who no longer are disabled at the time of their appointment, but whose well-being favors their employment at the institution with which they are familiar. Some of those individuals might have qualified initially for appointment in the competitive service by taking and passing the usual examination, and any of them could have obtained such competitive permanent positions after appointment by following that course. Indeed, a number of former patients of St. Elizabeth's, originally appointed under subsection (h), have done precisely that and now hold permanent appointments in the classified service with the accompanying rights and benefits. Although the appellees might have obtained a classified position after their appointment by taking and passing the same competitive examination that other nondisqualified persons routinely take, they have not attempted to do so.

The appellees' position is that because they perform the same work as other employees who occupy identical positions in the competitive service, they are entitled to the same benefits the other employees have, and that the denial of those benefits illegally discriminates against them on the basis of their former mental disability. The different treatment of the appellees from the other employees performing the same work, however, results not from the former mental disability of the appellees but from the fact that they were appointed without having to comply with the requirements for the competitive service. In order to achieve the benefits from employment in an environment with which they had become familiar and in which they were comfortable, the government permitted the appellees to obtain their positions without taking and passing the competitive examination that other employees were required to take to obtain the same jobs.

In my view, the government justifiably treated these two categories of employees differently in not giving to the appellees all

the civil service protections and benefits of the employees who obtained their positions through the competitive examination process. The difference in the nature of their appointments warranted the different rights and benefits given to each category. Similarly, I conclude that the different situations of the employees appointed under subsection (h) and those appointed under subsections (t) and (u) justified the conversion of the latter employees but not the former to competitive positions after two years if they had demonstrated their ability satisfactorily to perform the duties of the position despite their handicaps.

I do not read the *Shirey* case, upon which the court relies, as supporting its conclusion that the limited protections and benefits given the employees appointed noncompetitively under subsection (h) constituted improper discrimination against them. *Shirey* involved a deaf employee who was given a temporary appointment under subsection (u). At the time of the appointment, subsection (u) did not provide that handicapped employees appointed thereunder would be converted to competitive status after two years of satisfactory service. Following four-and-a-half years of satisfactory service, Shirey was separated in a reduction in force. Because he was not in the competitive service, Shirey had no right to "bump" employees who had lower retention status, a right competitive employees had. After Shirey was discharged, subsection (u) was amended to add the two-year conversion provision.

This court held that the affirmative action provision of the Rehabilitation Act of 1973, section 501, 29 U.S.C. § 791(b) (1976), did not permit the agency "to permanently deny Mr. Shirey the job benefits afforded his co-workers solely because he had been hired under excepted service authority, four and a half years earlier, on account of the severity of his physical disability." 670 F.2d at 1200. The court

emphasize[d] the narrow effect of this decision. The legal position of disabled employees like Mr. Shirey has changed significantly since January 1978.... In

March 1979 Executive Order 12125 gave handicapped excepted service employees relief basically identical to that Mr. Shirey seeks before this court. Finally, Mr. Shirey was the only handicapped excepted service employee at Godard to lose his job in the January 1978 reduction-in-force. In sum, Mr. Shirey's case seems to have arisen in the course of discovering unanticipated flaws in an otherwise praise-worthy government program for employing severely handicapped individuals, and we are confident that the system now in place will produce no more instances of discrimination as egregious as this one.

*Id.* at 1205 (footnote omitted).

Unlike the subsection involved in *Shirey*, subsection (h) has not been amended to give employees in the appellees' situation the relief they are seeking through judicial intervention. Moreover, also unlike Mr. Shirey, the appellees were not handicapped at the time of their appointment, but were given favored treatment because of a prior handicap that had ceased. As I have indicated, I think that the latter fact is a sufficient distinction that justifies the different treatment the government has given these differently situated groups of employees. In view of the "narrow effect" of the *Shirey* "decision," the broad language in that opinion should not be applied to the significantly different facts of the present case.

As a policy matter, the result reached in the present case is commendable. My difficulty with that result is that I do not think it reflects a proper use of judicial power. Congress has given the President broad discretion by regulation to administer the laws regulating government employment and therefore to determine the bases for appointments to positions in the executive branch and to define the rights and benefits of employees so appointed. 5 U.S.C. § 3301 (1982). The President in turn has delegated this authority to the Office of Personnel Management. Section 601, Exec.Order No. 11,222, 3 C.F.R. § 310 (1965), *reprinted in* 18 U.S.C. § 201 app. at 139 (1982). If the type of appointment

under subsection (h) and the rights and benefits of employees appointed under that subsection are to be changed, I think such changes must come from the Office of Personnel Management and not from the courts.