Willard La Vern PEALO et
al., Plaintiffs,

v.

FARMERS HOME ADMINISTRATION
et al., Defendants.

Civ. A. No. 1028–73.

United States District Court,
District of Columbia.

April 6, 1976.

Lee P. Reno, Florence Wagman Roisman, Washington, D. C., for plaintiffs.

Thomas G. Corcoran, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION AND BACKGROUND

On July 3, 1973, this Court entered an order to compel defendants to implement the Farmers Home Administration's interest credit loan program, pursuant to Section 521 of Title V of the Housing Act of 1949, 42 U.S.C. § 1490a. In its accompanying Memorandum Opinion, reported at 361 F.Supp. 1320, this Court held that for the defendants to certify various qualified members of plaintiff class as being eligible to receive direct housing loans under Sections 502 and 515 of the Act, and then to deny such individuals Section 521 interest credit loans by virtue of defendants' unilateral suspension of the program, would operate to frustrate the intent of Congress in enacting the Section 502 and 515 direct loan programs. It would have meant, in effect, that persons whom the Secretary of Agriculture, at his discretion, had determined would be unable to meet their necessary housing needs "with financial assistance from other sources"[1] would, nonetheless, have to be charged the maximum amount of interest allowable on such housing loans. The defendants' action was therefore found to be in derogation of the 1959 Housing Act.

Defendants appealed the Court's order to the United States Court of Appeals for the District of Columbia Circuit. A stay was granted but was subsequently dissolved. Just prior to the date scheduled for oral argument in the Court of Appeals, defendants represented to the court that they would continue to implement the programs in question as mandated by Congress, at least until the expiration of the current congressional authorization in 1977. The court of appeals thereupon granted plaintiffs' motion to dismiss the appeal on grounds that the appeal was moot.

The matter is now before this Court on plaintiffs' motion for reasonable attorneys' fees and related expenses for the work of counsel in pursuing this matter to a successful conclusion. Counsel for the plaintiffs aver by detailed affidavit that they have spent a total of 411.5 hours in connection with this matter, both in this court and at the appellate level, and have also incurred a total of $482.68 in expenses for which they seek to be reimbursed.

The defendants have interposed the following objections to the payment of fees in this case: (1) the Rural Housing Insurance Fund (RHIF) is comprised of public money and any judgment of attorneys' fees against the RHIF would be a judgment of attorneys' fees against the United States which is prohibited by 28 U.S.C. § 2412; (2) there is no "common fund" in existence from which fees can be awarded; and (3) the "legal fees" provision of the Act cannot

---

1. 42 U.S.C. § 1490a.

be read to permit the award of attorneys' fees of the kind sought by plaintiffs. The Court finds that defendants' objections do not prevent an award of attorneys' fees in this case.

## II. THE NATURE OF THE RHIF

The defendants' objection to the award of attorneys' fees in this case is based upon the nature of the RHIF. The Associate Administrator of the Farmers Home Administration, Frank W. Naylor, Jr., has submitted several affidavits concerning the nature and operation of the RHIF. They reveal the following pertinent information:

"The RHIF is a revolving fund and as such does not receive an annual loan appropriation from Congress. It does receive annually an appropriation sufficient in amount to cover the losses incurred two years previously. Congress recommends annual loan authorization levels for the current fiscal year. Thus, there are no funds to carry forward. The most that can be said to exist is a recommended loan level that has not been reached. There are no monies to transfer or to revert.

As a revolving fund, cash needs are met by the sale of certificates of beneficial ownership CBO's to the Federal Financing Bank, collections on outstanding borrowers' accounts, and borrowings from the Department of the Treasury.

The Federal Financing Bank (Bank) was established to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and to provide *lower interest cost to the United States.* In operation, the Bank purchases CBO's from FmHA thereby financing FmHA's loan programs. Bank officials have informed FmHA that the Bank finances its purchases by borrowing from the Treasury.

It is anticipated the Federal Financing Bank will be the sole purchaser of CBO's for the foreseeable future. The Bank is used to finance FmHA loan programs as it results in the lowest cost for financing to the United States.

The sale by the FmHA of CBO's to the Federal Financing Bank (Bank) is made at an interest rate set by the Bank. This rate is based on the cost of money to the Department of the Treasury with an add-on for the Bank's administrative expenses. Because the rate paid to the Bank may from time to time be lower than the interest rates for *unsubsidized* loans made by the FmHA out of, for example, the RHIF, at these times the FHIF may actually *make money* on the unsubsidized loans. It has been true, however, that in the past the FmHA has had to annually request Congressional appropriations to cover the actual losses sustained by the Fund in prior years. Nevertheless, it cannot be said that the Fund will always lose money. For one thing, Congress constantly reviews loan programs and might in the future take action which would prevent the making of subsidized loans. Then too, those borrowers who do receive interest credits currently have their situation reviewed every two years, and their financial posture may have improved to the point where they could be taken off of interest credits. Conceivably, if no more subsidized loans were being made *and* if a substantial number of borrowers with interest credits were taken off the program, then the RHIF might not continue to lose money and subsequent Congressional appropriations would not then have to be sought."

The defendants have sought to impress upon this Court that if additional monies were collected by the sale of CBO's for payment of attorneys' fees, Congress would have to make up any deficit, which would be a direct violation of 28 U.S.C. § 2412. On the other hand, the defendants maintain that if the RHIF happens to create an "overage," that could likewise not be used to pay attorneys' fees because of 42 U.S.C. § 1489, which requires overages to be paid to the Treasury.

## III. THAT THIS COURT CANNOT PAY PLAINTIFF'S ATTORNEYS' FEES AND COSTS FROM RHIF MONIES

OBTAINED FROM THE SALE OF CBO'S TO THE FEDERAL FINANCING BANK DOES NOT PRECLUDE AN AWARD OF ATTORNEYS' FEES AND COSTS FOR WHICH THEY ARE ENTITLED.

It is clear that the nature of the RHIF is such that if the Court were to award attorneys' fees from the monies obtained from the sale of CBO's to the Federal Financing Bank it would be diminishing the public treasury in violation of 28 U.S.C. § 2412. This is so not just because the monies would come from the Federal Financing Bank and thereby add to the national debt, but also because if such a payment did create a deficit it would require Congressional appropriation from the Treasury, which would clearly violate 28 U.S.C. § 2412. Nor does the Court find any Congressional permission, either express or implied, to use monies designated by statute for legal fees incurred in administering the RHIF for payment of the attorneys' fees sought herein, as the plaintiffs suggest. This statutory provision and its effectuating regulations, 7 C.F.R. §§ 1822.6 and 1822.85, merely permit the payment of legal fees for title searches and closing costs.

■ However, the foregoing does not preclude an award of attorneys' fees in this case. It merely prevents this Court from paying the fees *from* RHIF monies obtained from the sale of CBO's to the Federal Financing Bank.

■ Plaintiffs, by bringing this action, have incurred costs in conferring a benefit on the members of the class by releasing RHIF monies for their use, and are entitled to be reimbursed. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593, 606 (1970); *Trus-*

*tees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882). Defendants have opposed the award on the assumption that any award would come out of RHIF monies obtained from the sale of CBO's to the Federal Financing Bank. Under this belief, defendants have argued that since the RHIF is a loan program, and, therefore, there are no available monies, no fund exists from which an award could be given, thus defeating plaintiffs' motion for attorneys' fees. While it is true that the revolving nature of the RHIF makes it impossible to say that the plaintiffs have created a fund, per se, the fact that no monetary fund exists has been held to be an insufficient basis by the United States Supreme Court and the Court of Appeals for this Circuit for denying an award of attorneys' fees to a plaintiff who has secured a benefit for others. *Mills, supra,* 396 U.S. at 392–96, 90 S.Ct. at 625, 24 L.Ed.2d at 606; *National Treasury Employees Union v. Nixon,* 521 F.2d 317, 320–21 (D.C.Cir. 1975).

The fact that there is no "fund" per se was inevitable in this case. As was the case in *Mills,* this case was not an action to recover monies for the members of the class, as opposed to, for example, an impoundment case. See *National Council of Community Mental Health Centers, Inc. v. Weinberger,* 387 F.Supp. 991 (D.D.C.1975). Rather, plaintiff sought to secure a benefit for the class: the possibility of obtaining a loan at low interest rates.[2] Since the loans must be repaid, and since the CBO's are only used to raise enough money to cover the amount of approved loans, no fund per se could be established. But this does not prevent the Court from reimbursing the plaintiff for attorneys' fees and costs expended in obtaining the benefit for the class. See *Mills, supra; National Treasury*

---

**2.** "The Housing and Urban Development Act of 1968 added Section 521 to Title V of the 1949 Act, 42 U.S.C. § 1490a, which has come to be known as the 'interest credit program,' and which is the subject of this action. Section 521 permits the Secretary of Agriculture to set interest rates on loans made under Sections 502 and 515 as low as one per cent in order to serve lower-income borrowers and occupants. Al-

though a loan under this section formally bears the maximum interest rate, interest payments for lower-income borrowers are 'credited,' i. e., subsidized, in some amount which reflects the difference between what the borrower would pay at the maximum rate and what the borrower actually pays at the lower effective rate." *Pealo v. Farmers Home Administration,* 361 F.Supp. at 1321–22.

*Employees Union, supra.*[3] The only question is what means are available to obtain monies for reimbursement without violating 28 U.S.C. § 2412, and the only prohibition that § 2412 imposes is that the method of payment does not diminish the Treasury or increase the debt of the United States.

## IV. SECTION 2412 DOES NOT PREVENT THE COURT FROM USING RHIF MONIES TO CREATE A FUND TO REIMBURSE THE PLAINTIFFS FOR ATTORNEYS' FEES AND COSTS; OR, ALTERNATIVELY TO USE THE PROFIT ON INTEREST OF THE RHIF FOR THE AWARD.

■ As stated above, 28 U.S.C. § 2412 prohibits this Court from using RHIF monies obtained from the sale of CBO's to the Federal Financing Bank to pay an award of fees and costs. This does not mean, however, that this Court cannot utilize RHIF monies to create a fund from which an award can be paid. Nor does it mean that all monies held by the defendants are insulated by Section 2412.

### A. The "Beneficial Use" Method

■ The benefit secured in this lawsuit is the *use* of RHIF monies for low-interest loans. It appears to this Court that the plaintiffs can be reimbursed by the beneficial use of a sufficient sum of RHIF monies to meet the amount of the award. Such beneficial use would not violate Section 2412 because the principal (the monies obtained from the sale of the CBO's) would not be diminished, and Congress would not

have to appropriate monies to cover the award. Rather, the principal, which normally would be used for loans, would be deferred from that use and instead would be invested at an interest rate that would result in a profit. The profits would then be used to pay the award. This method is particularly attractive in the instant case since the interest owed on the CBO's is low enough that a substantial fund could be generated by reinvestment at a high interest rate. And, the fact that the government would incur some administrative cost has been held not sufficient to be a violation of Section 2412. *National Treasury Employees Union, supra,* 521 F.2d at 320.

### B. The "Interest Overage" Method

■ A second method of payment that would not violate Section 2412 is to take the award out of the "interest overage" created by the RHIF. As the Naylor affidavit reveals, see Sec. II, *supra,* the RHIF can create a profit or an "interest overage." If such monies exist, they could be used to cover the amount of the reimbursement set by the Court.

The defendants oppose this method on the ground that there is no such statute which authorizes the use of the assets of the RHIF for such a purpose. Further, defendants point to section 519 of the Housing Act of 1949, 42 U.S.C. § 1489, which directs the return to the miscellaneous receipts of the Treasury any sums in the RHIF which the Secretary of Agriculture determines are in excess of amounts needed to meet the obligations and carry out the purposes of the RHIF.

---

**3.** The government's arguments have failed to recognize that the "common fund" theory is really only part of the "common benefit" theory that arose in equity. See *Trustees v. Greenough, supra*; National Treasury Employees Union, *supra,* 321 F.2d at 320–21. The theory is that a party who secures a benefit for others should be entitled to be reimbursed for his or her costs and attorneys' fees in securing the benefit. When the benefit is obtained in litigation against the government, Section 2412 interposes a bar to an award of costs and fees from the government. And, since no in personam jurisdiction over those other persons who have received the benefit usually exists, see *National Council of Community Mental Health Centers, Inc. v. Weinberger,* 387 F.Supp. 991

(D.D.C.1974), the award cannot be taken from them, but see National Treasury Employees Union, *supra,* 521 F.2d at 351. Thus, the awards have been taken from the "funds" of monies created by the litigation but not as yet disbursed. The fact that such a fund does not exist, however, should not defeat the reimbursement of the plaintiff. Rather, it merely becomes the task of the Court to determine the method for creating a fund to pay the award. *Id.* at 321–33. And in this regard, when in litigation against the government, Section 2412's application is merely that the method chosen cannot diminish the Treasury or increase the debt of the United States unless it is for incidental administrative expenses.

First, this Court perceives no legal necessity for there to be a congressional authorization to use the RHIF monies to create a "fund" for reimbursing the plaintiffs as long as such use does not violate Section 2412. Certainly, Congress would not provide for such authority for it would not assume that a lawsuit would be necessary to secure compliance with the statute establishing the RHIF.

Second, this Court does not find 42 U.S.C. § 1489 a real impediment to the use of the "interest overage." The reason is that the RHIF saved operating costs during the time the RHIF program was suspended. Any present overage could have been absorbed at that time. Thus, any overage now in existence is not truly "excess" monies and the Secretary would not be required to return them. Additionally, it appears to this Court that the use of these monies to reimburse the plaintiffs would be carrying out the purposes of the RHIF and not in contravention of the intention of Section 1489.

This Court has set forth two possible methods of creating a "fund" to meet the amount of reimbursement that this Court might find fair and reasonable. Neither of these methods violate 28 U.S.C. § 2412 or any other statute brought to the Court's attention. Thus the method chosen will depend upon efficacy. If there is any "interest overage" in the RHIF, then it should be applied to the award of counsel fees. If none exists, or if it is not enough, then the "beneficial use" method will have to be employed. The Court will enter an Order that the parties are to confer within five (5) days of the date of this opinion concerning the method of payment and then notify the Court within five (5) days thereafter of the method of payment that is appropriate under the circumstances and submit an Order effectuating that agreement.

## V. THE COURT FINDS THAT AN AWARD OF $34,500 PLUS COSTS IS FAIR AND REASONABLE UNDER THE APPLICABLE STANDARDS.

The criteria for determining the amount of the award are set out in *Johnson v.* *Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), as adopted by this Circuit in *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177 (1974), as well as in numerous other recent cases, e. g., *Kiser v. Huge,* 517 F.2d 1275 (D.C.Cir. 1975); *National Association of Regional Medical Programs, Inc. v. Weinberger,* 396 F.Supp. 842 (D.D.C.1975); *National Council of Community Mental Health Centers, Inc. v. Weinberger,* 387 F.Supp. 991 (D.D.C. 1974). See also Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849, 922-929 (1975). Applying the criteria to the instant petition, the Court finds that $34,500.00 plus costs is a fair and reasonable award.

The amount of award for attorneys' fees was arrived at by considering first the affidavits of counsel. Ms. Roisman's affidavits reveal that she has received nothing in the way of fees from her client, the Rural Housing Alliance. According to her time logs, she and her partner, Arnold Sternberg, Esquire, spent, in 1973, 34.5 hours for preparation of the complaint (Roisman 32.5 hours, Sternberg 2 hours), 82 hours for preparation of the motions for preliminary injunction and for class certification and oral argument (Roisman 80 hours, Sternberg 2 hours). In 1974 and 1975, Ms. Roisman spent 80 hours in research and preparation of plaintiffs' motion for civil contempt and for supplemental relief and oppositions to defendants' motions for a stay in the District Court and the Court of Appeals, 39 hours on the motion to dismiss the appeal and the response to defendants' motion to dismiss the appeal, and 30 hours on the motion for attorneys' fees. The affidavit further states that Ms. Roisman employed a law student for research at a cost of $210.00 (70 hours at $3.00 per hour). Finally, the affidavit shows costs in the amount of $25.36. In summary, Ms. Roisman seeks compensation for 256.5 hours of work for herself and Mr. Sternberg for both district court and appellate work, $210.00 for law student fees, and expenses.

Lee P. Reno, Esquire, Ms. Roisman's co-counsel and counsel to plaintiffs Pealo and

Ayers has also submitted an affidavit. It reveals that he spent 81 hours for work in the district court and 74 hours for appellate efforts. His costs and expenses, which include most of the duplicating costs for the case, come to $457.32, most of which have been borne by the Rural Housing Alliance.

While a flat fee is not the standard to be used, it is a consideration to be weighed in fixing the total fee. Recently, the going rate for established counsel has been deemed to be $75.00 per hour. *Smith v. Saxbe,* 8 F.E.P. Cases 752 (D.D.C.1974), aff'd mem., 527 F.2d 853 (D.C.Cir. 1975); *Palmer v. Rogers,* Civ.No. 1016–72 (D.D.C. Nov. 17, 1975). This represents a significant increase over the past few years and particularly, since this litigation started and since most of the work was done. Thus, the Court will have to come to an average fee for counsel who, incidentally, did not supply the Court with their fee schedules. The Court believes that a $60.00 rate for Roisman and Sternberg and a $50.00 rate for Reno is fair and reasonable. It should be noted that a majority of the work in this case occurred at a time when the rates were much lower. Nevertheless, the rates set herein are higher than the average for these years because the Court recognizes and appreciates the exceptional skill and high caliber of attorney Roisman, which was amply demonstrated in this case. While the Court is not as familiar with Mr. Reno, his work on the instant case was of a high professional level which also entitles him to a higher rate. Using this rate, counsels' fees would come to $15,390 for Roisman and Sternberg and $7,750 for Mr. Reno. To this must be added the $210 for law student research, which this Court finds well within bounds. This would result in a total award of $23,350 without costs. The Court has examined the affidavits of counsel to determine whether a reduction might be appropriate.

If this Court were to determine the amount of the award by the flat rate, it would have to find the amount to be less than the fair and reasonable value of the services rendered. This case resulted in the release of millions of dollars in loans for many deserving individuals seeking needed housing. The Court therefore believes that a substantial incentive factor should be added to the award.

The Court has compared the time spent with the nature of the work done and found it to be well within reason. Furthermore, the Court has carefully scrutinized the time spent on securing the award of fees. See *National Council, supra,* 387 F.Supp. at 996. While the time spent on this was considerable (Roisman spent 40 hours), the question presented was difficult. Therefore, no deduction is necessary.

In considering the complexity of the case and the novelty of the issues, the Court notes that the case involved some statutory construction as well as determining Congressional intent. See 361 F.Supp. 1320. There was precedent, however, which made determination of the issues less difficult. Taken as a whole, the case was of moderate complexity. But this is only one factor, and any deduction in the incentive factor is far outweighed by the nature and extent of the benefits secured by this lawsuit which must also be considered.

Finally, the Court must consider the defendants' request for discovery concerning the affidavits of plaintiffs' counsel. Defendants apparently seek to determine whether the time spent is properly supported. While their assistance would of course be helpful, it must be remembered that the award is not against the defendants (here, the government), and they do not stand in an adversarial position on this issue. See *National Council, supra,* 387 F.Supp. at 995 n. 4. Further, it is the Court's responsibility to determine the fee and it is within its power to require disclosure of additional information if needed. It appears to this Court that in cases such as this, it is within the discretion of the Court whether to permit the defendants to engage in the requested discovery. In light of the role and power of the Court, the standards of behavior imposed on counsel by the Code of Professional Responsibility, and the fact that the burden is on counsel to

present sufficient support for the award, it would appear that the requested discovery should only be permitted in exceptional cases. Further, no good cause appears evident for this discovery. Defendants' request for this supplemental discovery will, therefore, be denied.

■ Applying the criteria set forth in the applicable cases cited above, the Court has determined that a reasonable award for the time expended by Roisman and Sternberg to be $15,000 and $8,000 for Reno. The Court further finds that an incentive factor of 50 per cent is appropriate, bringing the award to $22,710 * for Roisman and Sternberg, and $12,000 for Reno. Roisman and Sternberg are also entitled to their costs in the amount of $25.36, and Reno shall be awarded costs of $456.30. However, since the Rural Housing Alliance has paid for much of the costs sought by Reno, he shall be required to reimburse his client for what RHA has paid to him for costs in the instant case.

An Order in accordance with the foregoing shall be entered of even date herewith.

### ORDER

Upon consideration of the record culminating in the Court's Opinion and Order of April 6, 1976, and the conferences and submissions thereafter and the Court being satisfied that a fund for attorneys' fees in this case can be created from interest earned on amounts repaid by borrowers of subsidized loans under Sections 502, 515, 517, and 521 of the Housing Act of 1949, it is, by the Court, this 4th day of June, 1976,

ORDERED, that commencing ten days from this date, defendant Farmers Home Administration shall deposit and cause to be deposited any and all repayments from borrowers of interest credit loans under sections 502, 515, 517, and 521 of the Housing

Act of 1949, in federally insured, interest bearing, passbook savings accounts of randomly selected Savings and Loan Associations in the Washington, D.C. metropolitan area, until such time as sufficient amounts of interest have been accrued to pay the award of attorneys' fees of $35,191.66 awarded on April 6, 1976, and an additional amount of $3,765.95 awarded this day; and it is

FURTHER ORDERED, that defendants shall not deposit or cause to be deposited more than $40,000 in any one federally insured savings and loan association; and it is

FURTHER ORDERED, that the defendants shall file with the Court on a monthly basis a schedule of such deposits, including the names of savings and loan associations in which monies have been deposited, and the interest earned thereon; and it is

FURTHER ORDERED, that when interest has accrued in such amounts to cover this award, then defendants shall pay over such amount to plaintiffs' counsel; and it is

FURTHER ORDERED, that the defendants shall bear the costs of administering this program for creating a fund for the payment of attorneys' fees awarded in connection with this litigation.

### ORDER

Upon consideration of the motion for supplemental attorneys' fees, the points and authorities and affidavits in support thereof, and it appearing to the Court that the requested supplemental fees, and the amount thereof, are proper, fair and reasonable, it is, by the Court, this 4th day of June, 1976,

ORDERED, that the motion for supplemental attorneys' fees be, and the same hereby is, granted, in the amount of $3,765.95.

* Includes fee of $210.00 for law student research.