Kenneth SPRAGUE, et al., Plaintiffs,

v.

Margaret M. HECKLER, Secretary, United States Department of Health and Human Services, Defendant.

Civ. No. 83–0038 P.

United States District Court,
D. Maine.

Oct. 9, 1985.

See also 595 F.Supp. 1380.

Jack Comart, Linda Christ, Pine Tree Legal Assistance, Augusta, Me., for plaintiffs.

Paula D. Silsby, Asst. U.S. Atty., Portland, Me., Donald A. Gonya, Asst. Gen. Counsel, Baltimore, Md., for defendant.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY'S FEES

GENE CARTER, District Judge.

### I. *Procedural Background*

Plaintiffs move for an award of counsel fees pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(a), (b), and (d)(1)(A).

Plaintiffs brought this class action suit in February 1983 to challenge the Secretary's policies for adjudicating disability claims involving certain mental impairments. Plaintiffs allege that the Secretary had applied policies to the evaluation of such claims that conflicted with Title II and Title XVI of the Social Security Act. 42 U.S.C. §§ 401, *et seq.*, and §§ 1381, *et seq.* Specifically, Plaintiffs allege that the agency, instead of following the five-step determination process set out in its regulations at 20 C.F.R. §§ 404.1520 and 416.920, cut short that process if the individual applicant did not have a mental impairment meeting or equaling those listed in 20 C.F.R. Part 404, Subpart P., App. I. Under the regulations, applicants whose impairments do not meet "the listings" must still be evaluated as to their residual functional capacity to work. Plaintiffs allege that residual functional capacity in all younger persons and most older applicants not meeting the listings was effectively presumed, even though many such persons cannot work.

Plaintiffs sought to certify a class consisting of all Maine residents who are suffering from a mental illness whose Social Security benefits have been terminated since April 1, 1980, or whose application for benefits had been denied since April 1, 1980, on the basis that such persons were or are capable of substantial gainful employment despite their mental illness. They sought, among other things, an Order declaring that the Secretary's policies were unlawful, instructing the Secretary to reopen and reconsider the claims of all mentally disabled Title II and Title XVI applicants who have been denied benefits since April 1, 1980, and instructing the Secretary

to reinstate benefits to all class members whose benefits were terminated pending reconsideration.

During the pendency of this action, Congress enacted the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 460, 98 Stat. 1794 (1984), Section 5 of which requires the Secretary to revise her criteria for evaluating mentally impaired claimants and confers certain rights upon mentally impaired persons whose claims were denied or whose benefits were terminated after March 1, 1981.[1] On April 1, 1985, this Court entered a consent decree prepared by the parties. In addition to the rights conferred upon class members by the Social Security Disability Benefits Reform Act of 1984, the consent order provides, among other things, that the Secretary shall grant retroactive benefits to those reapplying under the Act for up to one year prior to the new application and that the Secretary shall individually notify class members of their right to reapply. The Plaintiffs thus obtained some of the relief they initially sought, partly through the enactment of the Reform Act and partly through the consent order.

## II. *Prevailing Party*

Under 28 U.S.C. § 2412(d)(1)(A) counsel fees may be awarded in actions against the United States if the claimant is the prevailing party, unless the position of the United States was substantially justified or special circumstances make an award unjust. The enactment of the Reform Act during the pendency of this action complicates resolution of the question as to whether Plaintiffs are the prevailing parties for purposes of 28 U.S.C. § 2412(d)(1)(A). The Court need not decide that question, however, because it has determined that, even assuming that Plaintiffs are the prevailing parties, the United States has met its burden of proving its position was substantially justified.

## III. *Substantial Justification*

The standard for determining whether the position of the United States was sub-

stantially justified has been thoroughly set out as follows:

The determinative issue on the motion for counsel fees under the EAJA is whether the Secretary's position, i.e., the Secretary's decision denying benefits, *see Cornella v. Schweiker*, 728 F.2d 978, 983 (8th Cir.1984), was substantially justified, which essentially turns upon the reasonableness in law and fact of the action taken. On this issue the government bears the burden. *Washington v. Heckler*, 756 F.2d 959, 961 (3d Cir.1985); *Wolverton v. Heckler*, 726 F.2d 580, 583 (9th Cir.1984). Although an adverse decision on the merits does not preclude a finding of substantial justification, *Martin v. Heckler*, 754 F.2d [1262] at 1264 [ (5th Cir.1985) ], the Secretary's position is unreasonable where she presents no evidence to support her position, e.g., *Hicks v. Heckler*, 756 F.2d 1022, 1025 (4th Cir. 1985), or where she applies an erroneous legal standard, *see Washington v. Heckler*, 756 F.2d at 967–68; *Howard v. Heckler*, 581 F.Supp. 1231, 1233 (S.D.Ohio 1984). Similarly, substantial justification does not mean "nonfrivolous," *McDonald v. Schweiker*, 726 F.2d 311, 316 (7th Cir.1983), and will not be found where the Secretary merely relies on "some evidence" of nondisability, *see Tressler v. Heckler*, 748 F.2d 146, 150 (3d Cir.1984). Rather, to meet her burden the Secretary must make a "strong showing" that her position was justified. *Washington v. Heckler*, 756 F.2d at 961; *Cornella v. Schweiker*, 728 F.2d at 982 & 983 n. 9. *But see Guthrie v. Schweiker*, 718 F.2d 104, 108 (4th Cir.1983) [Secretary's position is substantially justified although she does no more than rely on an arguably defensible administrative record] (footnote numbers omitted).

*Aldrich v. Heckler*, 609 F.Supp. 863, 865 (D.Me.1985).

▪ In this litigation, the Secretary has taken the position that the unlawful policy alleged by Plaintiff to exist has not been applied in Maine. The Secretary asserts

---

1. 98 Stat. 1801–2, to be codified in 42 U.S.C. §§ 421, 1381.

that she was required to complete discovery in order to make this determination. In support of her argument that this position was justified, the Secretary relies upon an affidavit and policy memorandum by the Director of Maine Disability Determination Services (DDS), an agency within the Maine Department of Human Services which makes disability determinations for the Social Security Administration pursuant to 20 C.F.R. § 404.1503 and § 416.903, and upon the alleged failure of Plaintiff to produce evidence that an unlawful policy was applied in Maine, despite extensive discovery.

Ann D. DeWitt is the Director of DDS. In a Memorandum to the Professional Staff of DDS, titled "Medical Vocational Considerations for Young Mentally Impaired Claimants," issued February 5, 1980, Ms. DeWitt made clear that, even if the Social Security Administration had intended to apply the policy Plaintiffs described in Maine, that policy was repudiated by the Maine DDS.[2] In her affidavit, Ms. DeWitt stated that the policy reflected in the memorandum "is the current Social Security policy, and this memo is still in effect in the Maine DDS." Affidavit of Ann D. DeWitt, ¶ 14.

Thus, despite findings of courts in other jurisdictions,[3] the Secretary has proffered substantial evidence that an unlawful policy was not applied in Maine and that, to the contrary, the Director of the Maine program had specifically directed her staff to the effect that persons with mental disabilities not meeting the listings may nonetheless be unable to work and therefore should be allowed benefits. Without rebuttal, this policy memorandum supports the Secretary's position that she was substantially justified in pursuing this litigation on the basis that no unlawful policy was applied in Maine.

Plaintiffs have not produced any direct evidence to rebut the affidavit and memorandum of Ann DeWitt. Plaintiffs rely on two cases in which the courts found that the Department of Health and Human Services (HHS) applied unlawful policies identical or similar to that allegedly applied in Maine. *Mental Health Ass'n of Minnesota,* 554 F.Supp. 157; *City of New York,* 578 F.Supp. 1109. In both cases, the district courts found that HHS had disseminated an unlawful policy from its central office under which younger mentally ill persons whose illnesses were not listed in agency regulations as *per se* meeting the requirements for benefits, could not be allowed benefits because they were presumed to have residual functional capacity. *City of New York,* 578 F.Supp. at 115; *Mental Health Ass'n of Minnesota,* 554 F.Supp. at 160–61.

In *City of New York,* Chief Judge Weinstein found that in 1978 the central office of the Social Security Administration re-

**2.** The Memorandum provided:

Returns from DAB have begun to show consideration for medical vocational allowances in younger workers with a history of a severe mental illness such as schizophrenia or manic depression. We have, in the past, been under the impression that if a young claimant did not meet or equal the listing, there was very little chance that he would be allowed as a medical vocational case. We have not given full consideration to Dr. Rosenberg's talk on functional impairments. If a mentally impaired worker has a moderately severe rating in regard to functional restrictions, the consideration of peer and authority relationships, accommodation to work stress, concentration on tasks and understanding of instructions must be made. If the consulting physician finds that the above criteria show a functional restriction of marked degree, the worker cannot be expected to carry out a regular job.

We must remember that the nature of mental illness is that it does not vary directly in proportion to age. It is not like arthritis which frequently develops to a greater degree of severity as an individual ages. Experience has shown us that some of the most functionally impaired persons we have seen have been young schizophrenic claimants.

This concept has been discussed thoroughly with Dr. Page, and at his suggestion, it is being shared with all persons who are responsible for making decisions.

**3.** *See City of New York v. Heckler,* 578 F.Supp. 1109 (E.D.N.Y.1984), *aff'd* 742 F.2d 729 (2d Cir. 1984); *Mental Health Association of Minnesota v. Schweiker,* 554 F.Supp. 157 (D.Minn.1982), *aff'd with modification* 720 F.2d 965 (8th Cir. 1983).

versed virtually all the determinations of the New York Office of Disability Determination in which younger applicants with psychiatric impairments not meeting the listings were allowed benefits. 578 F.Supp. at 1115. In that case, the Court stated, "Evidence of the fixed clandestine policy against those with mental illness is overwhelming." *Id.* The Court also found that SSA officials conducted sample reviews of state determinations on a sufficient basis to ensure, with what SSA contended was 95% accuracy, that the uniform policies of the SSA were being followed by the states. *Id.* at 1114.

██ The findings of the courts in *Mental Health Ass'n of Minnesota* and *City of New York* may justify an inference that the policy alleged here was disseminated on a national basis and therefore that it was in effect in Maine. However, the Secretary has produced direct evidence to the contrary (*supra* at 1292). In addition, in *Mental Health Ass'n of Minnesota* and *City of New York* the plaintiffs produced evidence of communications from the central office to the regional or state agency directing them to follow the illegal policy. 578 F.Supp. at 1116, 554 F.Supp. at 163. In addition, in *City of New York*, the director of the state agency testified that regional and central office reviews by the Secretary were carefully analyzed and followed by the state agency. 578 F.Supp. at 1114. In this case, Plaintiffs have produced no documents nor any other direct evidence that such a policy was disseminated to the Boston Region or the Maine DDS to rebut the state agency's written policy directive to the contrary.

Plaintiffs also rely on portions of the deposition of Frances Silsby, a claims supervisor at DDS. Pertinent excerpts from that deposition follow:

Q I'm going to ask you about the one final document, which is a memorandum, again, from Sandy Crank to the Regional Commissioner in Atlanta. Again, in the last paragraph, a restatement of the principal [sic] that: "When the Listing is determined to be not met or equalled, it is expected that the individual would have the mental capacity to perform at least unskilled work.

I would like to ask you, based on your experience at the DDS as Adjudicator, would it seem to you that Social Security was sending either explicit or implicit messages that mentally impaired individuals who didn't meet the listing could perform unskilled work?

A If that's what they're saying. I never heard it. We were never privy to the information.

Q But you were given the Informal Digest?

A Yes.

Q Would you say that there was confusion at DDS about that? I believe you stated earlier in fact there was confusion?

A It has been very difficult to evaluate the medical and vocational aspects of mentally impaired people.

Q Why would you say that is?

A Because of the subjective nature of the impairment and the doctors involved on the adjudicative level, both the assigning physicians, the reviewing physicians here and in Boston. They don't agree.

Q What sort of problems would be created, for example, by the review physician? How would that become a problem in adjudication?

A It is very difficult, you take two cases that appear to be similar to us. One would go one way and one the other. We could not get a good handle on how to handle these cases.

Q When you say one would go one way and one the other, are you referring to returns you received from Boston or Baltimore?

A Yes. We might send down two cases that seemed very similar and allow them both, and they would send one back and request a denial or vice versa, to deny them. We got many returns in that area.

Q Were you ever familiar with the case that DDS allowed, a mental impair-

ment case, which DDS may have allowed based on some medical vocational factors that was returned by DAB?

A  I know we have had them, certainly.

Q  Were any of those returns taking place between 1980 and 1983?

A  I would say yes.

Q  Can you recall examples of why those claims were returned?

A  Disagreements in assessing residual functional capacity.  Sometimes a difference in assessing severity.

Q  Did any of the returns raise the issues that have been raised in the memoranda and documents we just used?

A  Short of being impairment they were capable of doing unskilled work?

Q  Yes?

A  I don't specifically remember it stated that, but it was difficult to allow young people with impairment short of a listing level.

Q  Was it difficult to allow them also based on residual functional capacity?

A  That's what I'm saying, short of the listing level.

Deposition of Frances Silsby at 19–21.

Q  Now, do you believe that there are plenty of people who are capable of say, for example, cooking, shopping, fishing, watching TV, who can't work?

A  I would say yes, there must be.

Q  But that's not how Social Security looks at it?

MS. McCARTHY:  I object, leading question.

MS. CHRIST:  You are asking she answer the question, and your objection is noted for the record.

THE DEPONENT:  I think now, as opposed to '79 and '80, the quality of the claimant's activities and daily living are much closer scrutinized than they were in '79 and '80.

. . . .

Q  Would you say in general there has been a liberalizing of the adjudicatory climate in this area since 1983?

A  Yes.

*Id.* at 28.

■  A review of this testimony reveals that Ms. Silsby did not apply an unlawful policy in her capacity as a Maine DDS claims supervisor.  Nor was she aware of the existence of such a policy promulgated by the Social Security Administration.  Her testimony was that, due to SSA returns, "it was difficult to allow young people with impairment short of the listing level."  Deposition of Frances Silsby at 21.  Further, Ms. Silsby's testimony indicates that returns from the regional and central offices did not follow a pattern but were inconsistent.  *Id.* at 20.  Although the testimony may be viewed as some evidence that an unlawful policy may have been applied to claims by Maine applicants, it is entirely circumstantial in nature and it is not ultimately persuasive to that end, particularly in light of Ms. DeWitt's memo to the contrary.[4]

■  Thus, given the strong evidence that SSA's unlawful policy was repudiated by DDS, if it was disseminated to that office, and the lack of conclusive evidence that such a policy was in effect here, the Secretary was substantially justified in relying on her position that no unlawful policy was being applied or had been applied in Maine.

### IV.  *Common Benefit Theory*

■  Plaintiffs also seek attorney's fees pursuant to 28 U.S.C. § 2412(b).  That section states:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the

---

**4.**  Plaintiffs also rely on the high percentage of reversals by ALJs of initial DDS denials of benefits.  This is not necessarily probative and does not persuade the Court in the absence of any evidence as to the stated reasons underlying any such reversals.

United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

The legislative history of the Equal Access to Justice Act, which added this subsection, makes clear that Congress' intent in enacting this provision was to waive sovereign immunity so as to permit fee awards against the United States to the same extent they may be awarded against a private party at common law.[5]

As outlined in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the common law exceptions to the American Rule that each party bear the cost of its legal expenses include the "bad faith," "common fund," and "common benefit" doctrines, *id.* at 258, 95 S.Ct. at 1622, and these were clearly contemplated by Congress in amending 28 U.S.C. § 2412(b). H.R.Rep. No. 1418, 96th Cong. 2d Sess. 9, 17, *reprinted in* 1980 U.S.CODE CONG. & AD. NEWS 4987, 4996. Plaintiffs' assert that they are entitled to fees under the common benefit exception because they have conferred important nonpecuniary benefits on all class members.

The Supreme Court has spoken on the prerequisites for a fee award under the common benefit theory. In *Mills v. Elec-*

*tric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Court stated that such an award may be made only where plaintiffs have conferred "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Id.* at 393–94, 90 S.Ct. at 626. The Court further made clear in *Alyeska* that the common benefit theory does not extend to cases where plaintiffs have achieved results benefiting the general public. In *Alyeska* the Court stated, "[I]n this Court's common-fund & common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefiting." *Alyeska*, 421 U.S. at 264, n. 39, 95 S.Ct. at 1625 n. 39.

Plaintiffs assert that they have conferred a substantial benefit on members of an ascertainable class consisting of SSI and Social Security applicants and recipients. Plaintiffs further assert that by taxing the Secretary for Plaintiffs' fees the award will operate to spread the costs proportionately among those benefited. However, there are several problems with the application of the common benefit theory to this case.

First, it is questionable whether those benefiting from this lawsuit can be readily ascertained. Second, it is clear that a fee award against the Social Security Adminis-

---

**5.** H.R.Rep. No. 1418, 96th Cong.2d Sess. 9, *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 4984, 4987.

The EAJA has an unusual legislative history. The only Congressional Report on the bill enacted that contains any reference to the EAJA provisions is the House Conference Report, H.R.Rep. No. 1434, 96 Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 4953, 5003. The Act was added to a Small Business Assistance Bill by a floor amendment in the House of Representatives. The provisions of the floor amendment were virtually identical to those of S. 265, a bill that had been reported favorably by the House Judiciary Com-

mittee the day before, H.R.Rep. 1418, 96th Cong., 2d Sess. 15 (1980). With minor differences, S. 265 also had been reported favorably by the Senate Judiciary Committee, S.Rep. 253, 96th Cong., 1st Sess. 17 (1979), and passed overwhelmingly by the Senate. 125 Cong.Rec. 21,445. Our references to the legislative history of the EAJA are taken from H.R.Rep. No. 1418, 96th Cong.2d Sess. *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 4984. We note that there has been subsequent amendment to the statute, with an explanatory legislative report. Pub.L. No. 99–80, 99 Stat. 183 (1985), H.R.Rep. No. 120, 99th Cong., 1st Sess. (1985), U.S.Code Cong. & Admin.News 1985, p. 132.

tration will only shift the costs of this lawsuit to the general public or to those persons who pay Social Security taxes and not to those upon whom a benefit has been conferred.

A review of the case law in which common benefit awards have been made reveals that they are almost wholly confined to lawsuits against corporations or unions where an assessed fee is borne by all shareholders or union members who have benefited from the litigation. 1 Derfner, Wolf, *Court Awarded Attorney Fees*, § 3.01, 3–6. It is difficult to find any cases applying a common benefit theory against the government absent exceptional circumstances such as the existence of a common fund out of which the relief desired is to be paid.

In *Pealo v. Farmers Home Administration, et al.*, 562 F.2d 744 (D.C.Cir.1977), plaintiffs sought a court order requiring the FmHA to implement an interest credit loan program. The district court ordered the defendants to implement the program and the government appealed. Before oral argument, the FmHA decided to continue the program. The appeal was dismissed as moot and remanded to the district court with directions to vacate the judgment. The district court vacated the judgment but, after briefing and argument, awarded plaintiffs attorneys' fees.

The district court held that plaintiffs had incurred costs in conferring a benefit on the members of the class by releasing monies for their use, and therefore, plaintiffs were entitled to be reimbursed. 412 F.Supp. 561 at 564 (D.D.C.1976). The court concluded that no common fund had been created but that an award could be made under the common benefit theory. *Id.* at 564–65. However, because section 2412 prohibited fee awards against the United States "except as otherwise specified by statute," the court found that the method of payment could not diminish the Treasury or increase the debt of the United States, *id.* at 565, and so suggested that payment be made from interest accrued on the principal which normally would have been used

for loans. The Court of Appeals reversed, holding that the United States had not waived immunity for a fee award under the common benefit theory, but further held such doctrine inapplicable even absent a bar of sovereign immunity, because the costs were charged to the federal government and all citizen-taxpayers rather than to interest credit borrowers alone.

Plaintiffs allege that by citing this case in the House Report accompanying the EAJA, Congress made clear its intent to reverse the result in *Pealo* by passage of the EAJA. A thorough review of the legislative history does not convince the Court that such is the case. The House Report states:

> It has been generally held that existing section 2412 prevents an award of attorney fees against the United States, even under the common law exceptions, in the absence of express statutory authority. The issue, however, continues to be the subject of litigation. See, e.g., *Pealo v. Farmers Home Administration of the United States*, 562 F.2d 744 (D.C.Cir. 1977) (reversing lower court's application of "common benefit" exception); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397 (1st Cir.1977) (refusing to apply "bad faith" conception). This subsection reflects the belief that at a minimum, the United States should be held to the same standard in litigating as other parties and that no justification exists for exempting the United States from fee awards in these limited situations. H.R. Rep. No. 1418, 96 Cong., 2d Sess., at 17, *reprinted in* 1980 U.S.CODE CONG. & AD. NEWS 4996.

The legislative history does not speak to the applicability of the common benefit exception in *Pealo* but rather to the idea that should the theory be found applicable, EAJA lifts the bar of sovereign immunity. Congress sought to place the United States on the same footing as private parties under the common benefit theory, not to re-

write its prerequisites as propounded by the Supreme Court in *Mills* and *Alyeska.*[6]

The only circuit to address this issue in a lawsuit against the Social Security Administration concluded the common benefit fund to be inapplicable. In *Jordan v. Heckler*, 744 F.2d 1397 (10th Cir.1984), the Tenth Circuit overturned a district court decision awarding fees under the common benefit theory where plaintiffs had challenged the accounting procedure used by the Secretary to resolve allegations of representative payee misuse of funds. The Court found that the costs of litigation would not be spread out only among the group benefited but would be borne by all Social Security taxpayers. *Id.* at 1400. Most other courts have reached similar conclusions in cases involving litigation against government bodies. *See Cantwell v. County of San Mateo*, 631 F.2d 631 (9th Cir.1980); *American Association of Marriage & Family Counselors v. Brown*, 593 F.2d 1365 (D.C.Cir.1979); *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5th Cir.1975); *Satoskar v. Indiana Real Estate Commission*, 517 F.2d 696 (7th Cir. 1975); *Lebanks v. Spears*, 417 F.Supp. 169 (E.D.La.1976). Cases where fees have been allowed involve unusual circumstances, such as a common fund from which those benefiting can be taxed, as well as a common benefit. *See National Treasury Employees Union v. Nixon*, 521 F.2d 317 (D.C.Cir.1975).

It is clear that Congress intended the federal government to be subject to fee awards under the common benefit exception where applicable. But the standard for that exception, as set out in *Alyeska*, requires that costs be shifted "with some exactitude to those benefiting," 421 U.S. at 264, n. 39, 95 S.Ct. at 1625, n. 39, and that standard can not be met in this case. If an award is charged against the Social Security Administration it will be paid by all taxpayers or by all who pay Social Security

taxes, not by those who receive mental disability benefits in Maine. Therefore, an award to Plaintiffs cannot be made on the common benefit theory basis.

## V. *Order*

For the foregoing reasons the Plaintiffs' Motion for an Award of Counsel Fees Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(a), (b) and (d)(1)(A) is hereby DENIED.

So ORDERED.

---

6. The same is true of the House Report's citation of *Natural Resource & Defense Counsel v. Environmental Protection Agency*, 484 F.2d 1331 (1st Cir.1973). H.R.Rep. No. 1418, 96th Cong., 2d Sess. 9, *reprinted in* 1980 U.S.CODE CONG. & AD.NEWS 4987. Subsequent courts have questioned whether the award under *NRDC*, absent its statutory basis in the Clean Air Act, 42 U.S.C. § 1857c–5, *et seq.*, in addition to the common benefit theory, would have survived *Alyeska*. *See Save Our Sound Fisheries Ass'n v. Callaway*, 429 F.Supp. 1136 (D.R.I.1977).